STATE of Utah, Plaintiff and
Respondent,

v.

Michael C. THOMPSON, Bruce A.
Conklin and Michael Ziemski,
Defendants and Appellants.

No. 860357–CA.

Court of Appeals of Utah.

March 9, 1988.

Max D. Wheeler, Rodney R. Parker (argued), Snow, Christensen & Martineau, Salt Lake City, for defendants and appellants.

David L. Wilkinson, State Atty. Gen., Stephen J. Sorenson, Chief, Litigation Div., Richard M. Hagstrom (argued), David J. Schwendiman (argued), Robert N. Parrish, Stanley H. Olsen, Asst. Attys. Gen., for plaintiff and respondent.

Before BENCH, DAVIDSON and ORME, JJ.

## OPINION

BENCH, Judge:

Defendants appeal their convictions on several counts of bribery, antitrust, and racketeering. This appeal was initially filed with the Utah Supreme Court and was transferred to this Court pursuant to R.Utah S.Ct. 4A. We affirm the convictions.

*Facts*

Between 1976 and early 1984, L. Brent Fletcher was employed as security officer for Utah Power and Light Company (UP & L). As security officer, Fletcher's duties were to determine the security needs of the company, make recommendations to management, and act as coordinator between management and the security guard services. In 1978, UP & L decided to hire the services of a security guard company on a full-time basis. On Fletcher's recommendation, UP & L executed a contract with defendant Michael Thompson's company, Mike Thompson Associates (MTA), in February 1978. This contract was not competitively bid.

In 1979, Jack Wall, Fletcher's brother-in-law, was hired by MTA. At Fletcher's request, Wall opened a bank account in the name of Security Management Consultant Services. Between January and June 1979, Wall deposited approximately $23,000 in checks from MTA into this account. In June 1979, Wall turned over the account and its records to Fletcher at his request. UP & L and MTA renewed their contract in March 1981.

Thompson left MTA in 1982 and formed Information Associates, a security consulting firm, with defendant Bruce Conklin, a former employee of MTA. Defendant Michael Ziemski, also a former employee, took control of MTA and signed a new contract with UP & L in October 1982. Ziemski later changed the name of MTA to Vanguard International Associates, Inc. In 1983, Ziemski transferred control of Vanguard to Conklin. An assignment of the UP & L contract was executed in March 1984.

During the spring of 1983, Information Associates deposited approximately $25,-000, in seven separate payments, into the account of Augie Investments, also owned by Fletcher. Meanwhile, Vanguard deposited about $163,000 into the account of Information Associates.

The State of Utah, alleging these multiple payments to Fletcher were bribes as part of a scheme to eliminate competition for the UP & L security contract, charged Thompson with seven counts of commercial bribery, each a class B misdemeanor in violation of Utah Code Ann. § 76–6–508(b) (1978), one count of antitrust group boycott, a second degree felony in violation of Utah Code Ann. §§ 76–10–914 and –920 (1979), and two counts of racketeering, second degree felonies in violation of Utah Code Ann. § 76–10–1603 (1981). Ziemski and Conklin were each charged with seven counts of bribery, one count of antitrust group boycott, and one count of racketeering. Fletcher, also a defendant, was charged with counts similar to Thompson. Fletcher was tried separately and convicted prior to defendants' trial. His appeal is also decided this date. *See State v. Fletcher*, 751 P.2d 822 (Utah App.1988).

Pretrial motions to dismiss all counts were denied. Defendants' motion to suppress evidence obtained pursuant to a secret investigation in Emery County was also denied. The case was tried to a jury on July 18 through August 1, 1985, the Honorable Judith M. Billings presiding. The jury found each defendant guilty of five counts of bribery and of all racketeering and antitrust counts. Motions for mistrial were denied. Thompson was sentenced to serve not less than one nor more than fifteen years in the Utah State Prison. Conklin and Ziemski were each sentenced to serve one year in the Salt Lake County Jail on work release. Each defendant was fined $25,000 for the antitrust violations. Based on the racketeering convictions, the court also ordered forfeiture of all business interests of defendants in the guard companies involved in the case. The sentences were all stayed pending appeal.

On appeal, defendants challenge the jurisdiction of the trial court and the court's denial of their motion to suppress certain evidence. Defendants also challenge specific jury instructions, each of their convictions, and the trial court's denial of their motion for a mistrial.

*Jurisdiction and Probable Cause for Arrest*

■ Defendants first argue the affidavit upon which their arrest warrants were based failed to establish probable cause. The arrest warrants were therefore allegedly invalid, and the trial court was deprived of jurisdiction over defendants. The Utah Supreme Court has "reject[ed] the position that the probable cause requirement for arrest warrants is jurisdictional." *State v. Schreuder,* 712 P.2d 264, 272 (Utah 1985). In *Schreuder,* the defendant challenged her conviction on the ground that the statement presented in support of the arrest warrant failed to establish the requisite probable cause. The Court, assuming lack of probable cause for the purposes of discussion, adopted the majority rule that an "illegal arrest or detention does not void a subsequent conviction." *Id.* at 271 (quoting *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865–66, 43 L.Ed.2d 54 (1975)). The Court explained:

> [The] probable cause requirement for an arrest warrant becomes moot by the time a defendant has been convicted because the much more stringent requirements of proof at trial have been employed to protect the defendant.

712 P.2d at 272. In light of *Schreuder,* we hold defendants' challenge to the trial court's jurisdiction is moot.

*Admissibility of Evidence*

Defendants next argue the trial court erred in denying their motion to suppress certain evidence. The instant case began with a secret investigation conducted in Emery County under the authority of Judge Boyd Bunnell, Seventh District Court, and pursuant to Utah Code Annotated §§ 77–22–1 through –3 (1982), commonly referred to as the Subpoena Powers Act or the Utah Mini–Grand Jury Act. During the investigation, the prosecution used subpoenas duces tecum to accumulate most of the evidence used at trial, including tax and bank records from defendants' accountants and banks. Upon a motion by defendants challenging the constitutionality of the Act, Judge Bunnell concluded the Act had been abused and was subject to continual abuse due to its broad terms and provisions. Judge Bunnell declared the Act unconstitutional, dismissed the investigation, and quashed all outstanding subpoenas. The prosecution's appeal of that ruling is now pending before the Utah Supreme Court. *In the Matter of a Criminal Investigation,* No. 20268 (Utah filed Oct. 25, 1984).

Based on Judge Bunnell's ruling, defendants filed a motion to suppress all evidence seized pursuant to the investigation. After a hearing on December 27, 1984, Judge Billings held Judge Bunnell's ruling to be the law of the case. However, in a memorandum decision dated January 10, 1985, Judge Billings denied defendants' motion to suppress. The evidence was subsequently admitted to prove the substance of the crimes charged.

The basis for the trial court's denial of defendants' motion to suppress was as follows:

> The appropriate standard for suppression of the evidence acquired under the "Subpoena Powers Act" in this case requires that the defendants show, as the State contends, a "substantial violation" of defendants' constitutional rights and that the violation was "not committed in good faith," as required by Rule 12(g), Utah Rules of Criminal Procedure (Section 77–35–12(g)). Defendants have neither acknowledged this Rule, nor attempted to meet the required showing for suppression of evidence.

On appeal, defendants claim the evidence in the instant case was obtained without legal process and should therefore be suppressed. Defendants contend the government's actions were in violation of their individual rights to and expectations of privacy.

■ The enforcement of a subpoena duces tecum is subject to fourth amendment

restrictions against unreasonable searches and seizures, although not to the extent of a search warrant. *Oklahoma Press Pub. Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). Defendants' claims to an expectation of privacy are rights protected under the fourth amendment. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Furthermore, "[e]vidence is suppressed or excluded only if the same was obtained by a violation of the Fourth Amendment, designed to protect a person's right to privacy and property." *State v. Montayne,* 18 Utah 2d 38, 41, 414 P.2d 958, 960 (1966).

In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the United States Supreme Court created the good faith exception to the exclusionary rule: where an officer acts in objectively reasonable reliance on a subsequently invalidated warrant, the exclusionary rule does not apply. The Utah state legislature codified the *Leon* good faith exception in Utah Code Ann. § 77–35–12(g) (1982). As previously discussed, the trial court denied defendants' motion to suppress for failure to meet the requirements of section 77–35–12(g).

However, the Utah Supreme Court recently invalidated section 77–35–12(g). In *State v. Mendoza,* 748 P.2d 181 (Utah 1987), the Court rejected the prosecution's argument that the good faith exception should apply to an invalid, warrantless stop and search of a vehicle. The Court explained that because "no outside authority on which the officers could reasonably rely expressly authorized the search …, the policy foundations of the *Leon* exception do not appear in searches of [this kind]." *Id.* at 185. Furthermore, section 77–35–12(g) went beyond the scope of the good faith exception in requiring defendants to prove a substantial violation of their fourth amendment rights. Since section 77–35–12(g) purported to create a good faith exception to an investigatory stop and search and because it improperly shifted the burden of proof, the Court found the statute violated the fourth amendment of the United States Constitution.

Although section 77–35–12(g) is now invalid, the good faith exception to the exclusionary rule under *Leon* is still valid.

Defendants argue the good faith exception applicable to search warrants does not apply to the execution of subpoenas issued pursuant to a statute subsequently declared unconstitutional. This position is contrary to *Illinois v. Krull,* —— U.S. ——, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). In *Krull,* the Court granted certiorari to determine whether the good faith exception to the exclusionary rule should be recognized when officers act in objectively reasonable reliance upon a statute authorizing warrantless administrative searches where the statute is ultimately found to be unconstitutional. An Illinois statute permitted government officers to conduct warrantless searches of the records of dealers in automobiles and automobile parts. Such a search showed Krull to be in possession of stolen automobiles. Subsequent to the search, a federal court in an unrelated matter held the Illinois law to be unconstitutionally broad. Upon motion by defendant, the trial court suppressed the evidence based on the federal court ruling. The Illinois Supreme Court affirmed, rejecting the state's good faith exception argument.

The United States Supreme Court reversed. The Court explained the good faith exception was established because the deterrent effect and remedial purpose of the exclusionary rule are not served where an officer acts in objectively reasonable reliance on a search warrant issued by a neutral magistrate. Likewise, the Court held, "if [a] statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written." *Id.* 107 S.Ct. at 1167. In *Mendoza,* the Utah Supreme Court noted, "*Krull* does not affect our characterization of *Leon.* In both cases, the officers conducting the searches did so in objectively reasonable reliance on prior, external authorization." 748 P.2d at 185 n. 3. Likewise, in the instant case, the subpoenas duces tecum were executed in

objectively reasonable reliance on prior, external authorization.

■ This Court may affirm a trial court's decision to admit evidence on any proper ground, even though the trial court assigned another reason for its ruling. *State v. Barber*, 747 P.2d 436 (Utah App. 1987). Regardless of the decision of the Utah Supreme Court on the constitutionality of the Utah Mini–Grand Jury Act, we hold the evidence obtained pursuant to the subpoenas duces tecum was admissible under the principle set forth in *Krull*. The trial court's denial of defendants' motion to suppress is affirmed.

*Antitrust and "Group Boycott"*

Defendants contend they were improperly charged with and convicted of conduct in violation of the Utah Antitrust Act, Utah Code Ann. §§ 76–10–911 through –926 (1979). This is the first criminal prosecution under the Utah Antitrust Act and is thus a case of first impression. The general provisions of the Utah Antitrust Act are similar in many respects to their federal counterparts in the Sherman Act, 15 U.S.C. §§ 1 through 7 (1987). Section 76–10–926 provides, "The legislature intends that the courts, in construing this act, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."

Section 76–10–914(1) of the Utah Antitrust Act, like section 1 of the Sherman Act, states, "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is declared to be illegal." Section 76–10–920 further provides:

Any person who violates section 76–10–914 by price fixing, bid rigging, agreeing among competitors to divide customers or territories, or by engaging in a group boycott with specific intent of eliminating competition shall be punished, if an individual, by a fine not to exceed $50,000 or by imprisonment for an indeterminate time not to exceed one year, or both or, if by a person other than an individual, a fine not to exceed $100,000.

Defendants point out there are three elements to the offense charged in the instant case: (A) a contract, combination, or conspiracy in restraint of trade in violation of section 76–10–914; (B) in the form of a group boycott; and (C) with specific intent to eliminate competition.

(A)

Defendants argue federal courts uniformly have refused to find commercial bribery to be a contract, combination, or conspiracy in violation of section 1 of the Sherman Act. Commercial bribery is defined in Utah Code Ann. § 76–6–508(b) (1978) as follows:

A person ... without the consent of the employer or principal, contrary to the interests of the employer or principal ... confers, offers, or agrees to confer upon the employee, agent, or fiduciary of an employer or principal any benefit with the purpose of influencing the conduct of the employee, agent, or fiduciary in relating to his employer's or principal's affairs[.]

In *United States v. Boston and Maine Railroad*, 380 U.S. 157, 162, 85 S.Ct. 868, 871, 13 L.Ed.2d 728 (1965), the United States Supreme Court held, "[I]t is doubtful that this indictment ... alleges anything more in substance than a bribe. Bribery might well be in the family of offenses covered under a conflict of interest statute. But it is more remote from an antitrust frame of reference." In *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 687 (9th Cir.1976), *cert. denied*, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976), the Ninth Circuit Court of Appeals held, "[C]ommercial bribery, standing alone, does not constitute a violation of the Sherman Act." And in *Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F.Supp. 633, 645 (D.Alaska 1982), the court held, "Commercial bribery does not in itself constitute a violation of the Sherman Act."

While it is true that commercial bribery alone is not conduct in violation of federal antitrust law, "[w]hen the bribery is coupled with other acts tending to restrain trade, a claim under the Sherman Act may

be established." *Hitachi*, 547 F.Supp. at 645; *see also Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir.1980). In the cases cited by defendants, there was no evidence of any affirmative acts, coupled with the bribery, to restrain trade. In the instant case, however, the prosecution presented substantial evidence of other affirmative acts in restraint of trade, e.g., Fletcher's refusal to accept proposals from other security guard companies.

■ The dissent suggests that, under the majority opinion's view, every commercial bribery in which the payee performs his end of the bargain would be an antitrust violation. Such is not the case. Commercial bribes paid to an employee, agent, or fiduciary of UP & L could be for other purposes, including rate adjustments, waiver of service fees, and waiver of safety requirements. Such purposes are clearly not in restraint of trade or anticompetitive. Furthermore, had defendants paid Fletcher the bribes in order to influence him to deal exclusively with them only after he had received other bids, their actions arguably would not have been a conspiracy entered into primarily to eliminate competition or restrain trade. However, in the instant case, the primary purpose of the bribes was to restrain trade by eliminating all competition for the UP & L security contract. The first element of the offense was therefore established.

### (B)

Defendants next argue their alleged agreement with Fletcher did not constitute a group boycott, and, therefore, the prosecution failed to establish the second element of the offense. Federal courts have long held that whether a particular action or agreement violates the Sherman Act depends on whether it is an unreasonable restraint on trade. *Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918). In *Chicago Board of Trade*, the United States Supreme Court established the "rule of reason" standard to determine whether a restraint was unreasonable:

To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

*Id.* at 238, 38 S.Ct. at 244. In other words, "the factfinder [must] decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982).

While federal courts have utilized the rule of reason in determining the legality of most restraints alleged to be in violation of the Sherman Act, they have also, by experience, been able to categorize certain business practices or relationships as per se unreasonable. In *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), the United States Supreme Court held, "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." These per se practices include price fixing, division of markets, group boycotts, and tying arrangements. *Id.* Recognition of the per se rule obviates the costly and complex litigation a complete rule of reason inquiry entails. *Id.; see also Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985).

■ Although there is a "marked lack of uniformity"[1] among the federal courts in defining the term group boycott, a classic per se group boycott exists where two or more competitors on the same level of the market structure agree to eliminate a target horizontal competitor by combining to deny the target of elements needed in order to compete. *Federal Maritime Comm'n v. Aktiebolaget Svenska Amerika Linien*, 390 U.S. 238, 250, 88 S.Ct. 1005, 1012, 19 L.Ed.2d 1071 (1968); *United States v. General Motors Corp.*, 384 U.S. 127, 140, 86 S.Ct. 1321, 1327–28, 16 L.Ed.2d 415 (1966); *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959). *See also* L. Sullivan, *Handbook of the Law of Antitrust* 230 (1977). The restraining agreement need not "entirely exclude its victims from the market," but only "[prevent them] from making free choices between market alternatives...." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 528, 103 S.Ct. 897, 903, 74 L.Ed.2d 723 (1983). It is the horizontal effect of a group boycott, a "naked [restraint] of trade with no purpose except stifling of competition," which typically warrants application of per se illegality. *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963).

Vertical nonprice restraints, i.e., combinations of persons at different levels of the market structure, are generally not treated under the per se doctrine but are examined under the rule of reason standard. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). As the United States Supreme Court has explained:

> We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. They may be too dangerous to sanction or they may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business and within the "rule of reason." We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack ... any redeeming virtue."

*White Motor Co.*, 372 U.S. at 263, 83 S.Ct. at 702 (quoting *Northern Pacific*, 356 U.S. at 5, 78 S.Ct. at 518) (citations omitted). In *Continental T.V.*, the Court further explains that while "[v]ertical restrictions reduce intrabrand competition by limiting the number of sellers of a particular product competing for the business of a given group of buyers ..., [they also] promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." 433 U.S. at 54, 97 S.Ct. at 2560.

Under the Sherman Act, both classic group boycotts and vertical restraints determined unreasonable are subject to criminal penalties. Section 1 of the Sherman Act provides:

> Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

■ Section 76–10–920 of the Utah Antitrust Act, however, criminalizes only the four types of conduct that have been clearly labeled as per se violations of the Sherman Act.[2] The rule of reason analysis has no part in the criminal provisions of the Utah Antitrust Act. Therefore, unless defendants' conduct was in the form of a

---

1. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 543, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978).

2. In contrast to the Sherman Act, the Utah Antitrust Act "attempts to provide both the prosecutor and the community at large with a clear definition of what conduct is criminally proscribed." J. Dibble & J. Jardine, *The Utah Antitrust Act of 1979: Getting Into The State Antitrust Business*, 1980 Utah L.Rev. 73, 83.

group boycott, it was not criminal under Utah law.

The instant case is not a classic group boycott. The prosecution claims this is an arrangement between a group of horizontal competitors, i.e., the three defendants. At no time, however, did any two of defendants co-exist as competitors. Rather, they were successive owners of the same security guard company, albeit the company had different names under different owners. Therefore, the alleged agreement between defendants and Fletcher did not constitute a classic group boycott under the federal definition.

However, the group boycott specified in section 76–10–920 is not the classic group boycott recognized by federal courts. Under the classic (per se) group boycott definition, proof of intent and/or effect is not required, but it is conclusively presumed the boycott is anticompetitive and in violation of antitrust laws. *Northern Pacific,* 356 U.S. at 5, 78 S.Ct. at 518. Under section 76–10–920, the prosecution is required to prove a defendant engaged in a group boycott *"with [the] specific intent of eliminating competition."* When interpreting a statute, we assume the legislature used each term advisedly and in its proper sense. *Horne v. Horne,* 737 P.2d 244, 247 (Utah App.1987); *State v. Franklin,* 735 P.2d 34, 37 (Utah 1987). We construe the statute "on the assumption ... that the intent of the Legislature is revealed in the use of the term in the context and structure in which it is placed." *Ward v. Richfield City,* 716 P.2d 265, 266 (Utah 1984). By requiring a separate element of "specific intent of eliminating competition," the legislature clearly did not adopt the classic group boycott definition formulated by the federal courts.

■ The term group boycott as used by the Utah state legislature more closely resembles the general definition of boycott: "a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 541, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978). In the instant case, defendants, through bribes, enlisted Fletcher to refuse any bids from their competitors, the targets of the boycott. A group boycott under the Utah Antitrust Act requires at least two conspirators, but neither the number of boycotters nor their market relationship with the target is determinative of criminal liability. Rather, the intent of the contract, combination, or conspiracy is the deciding element.

The dissent proposes an alternative interpretation of section 76–10–920, suggesting the specific anticompetitive intent element is intended to narrow the scope of the federal definition of a classic group boycott. The dissent also suggests the majority opinion fails to consider the anticompetitive effect of defendants' actions in the relevant marketplace. In essence, the dissent suggests we adopt the classic per se definition of group boycott but that we use the rule of reason in evaluating the elements of proof. Federal courts have consistently held that classic group boycotts include, by definition, the elements of anticompetitive intent and effect in the relevant marketplace. *See National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma,* 468 U.S. 85, 103–104, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984) (*"Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct."). It makes no sense to adopt the classic per se definition of group boycott and then to require proof of anticompetitive intent and market effect. We therefore cannot accept the dissent's interpretation of section 76–10–920.

■ Our interpretation of the Utah Antitrust Act is in line with a current trend in federal case law to focus not on the form of the conspiracy, but on the intent of the conspirators. In *Continental T.V.,* the United States Supreme Court, after establishing the rule of reason analysis as the general standard for vertical restraints, stated "we do not foreclose the possibility that particular applications of vertical restrictions might justify *per se* prohibition."

433 U.S. at 58, 97 S.Ct. at 2562. Increasingly, federal courts are recognizing per se group boycotts between a single horizontal competitor and a vertically related company. *See Cascade Cabinet Co. v. Western Cabinet and Millwork,* 710 F.2d 1366 (9th Cir.1983); *Com–Tel, Inc. v. DuKane Corp.,* 669 F.2d 404 (6th Cir.1982); *Corey v. Look,* 641 F.2d 32 (1st Cir.1981). *See also* Sullivan, *Antitrust,* at 231 n. 1; Decker, *The Numerosity Requirement For Group Boycotts: Toward a Horizontal Benefit Analysis,* 18 U.S.F.L.Rev. 577 (1984); Bauer, *Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination,* 79 Colum.L.Rev. 689 (1979). These cases and commentators urge that when applying the per se rule to a group boycott, the key inquiries should not be the number or nature of the conspirators, but their intent and/or the effect of the restraint on competition. No logic supports ignoring defendants' anticompetitive conduct in the instant case solely because they failed to recruit a second horizontal competitor into their conspiracy. *See* Decker, *The Numerosity Requirement,* 18 U.S.F.L.Rev. at 587 ("[I]f a single firm has the necessary influence to effectuate an exclusionary boycott with a supplier or customer, such conduct should not escape the *per se* rule simply because that firm did not combine with others at its own market level to exert its influence."). Although the coercive pressure was applied vertically, the stifling of competition was horizontal. *Com–Tel, Inc.,* 669 F.2d at 409. A conspiracy in the form of a group boycott was therefore established.

### (C)

Under our interpretation of sections 76–10–914 and –920, therefore, the group boycott involving defendants and Fletcher would be criminal upon a proper showing of a specific intent to eliminate competition. When the specific intent of a defendant is an element of the criminal offense charged, the intent may be inferred from the defendant's conduct and surrounding circumstances. *State v. Fowler,* 745 P.2d 472, 475 (Utah App.1987); *State v. Kennedy,* 616 P.2d 594, 598 (Utah 1980).

In the instant case, not one of the contracts between UP & L and defendants was competitively bid. Representatives of other large companies testified the usual course of action when selecting a security guard company is open bidding. Several representatives of other security guard companies testified their attempts to submit bid proposals to Fletcher were either refused or ignored. Sufficient evidence was presented to the jury to infer a specific intent of eliminating competition on the part of defendants. The third element of the offense was clearly established.

We hold defendants were properly charged with engaging in a criminal group boycott under sections 76–10–914 and –920. Under our interpretation of the Utah Antitrust Act, an individual is clearly on notice that if he (or she) engages in a contract, combination, or conspiracy in restraint of trade, *with the specific intent of eliminating competition,* regardless of who his co-conspirators are, he will be criminally liable.

Because there is some evidence, including reasonable inferences, to support every element of the jury's verdict, we will not disturb it on appeal. *State v. Garcia,* 744 P.2d 1029 (Utah App.1987). Defendants' convictions on the antitrust counts are affirmed.

### Racketeering and "Pattern" of Activity

Defendants argue they were improperly charged with and convicted of conduct in violation of the Utah Racketeering Influences and Criminal Enterprise Act, Utah Code Ann. §§ 76–10–1601 through –1608 (1981) (the RICE Act). When this case was tried, section 76–10–1603(1) provided:

> It shall be unlawful for any person who has received any proceeds derived, whether directly or indirectly, from a pattern of racketeering activity in which such person has participated, as a principal, to use or invest, directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any interest in, or the establishment or operation of, any enterprise.

A "pattern of racketeering activity" was defined in section 76–10–1602(4) as:

> engaging in at least two episodes of racketeering conduct which have the same or similar objectives, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events, provided at least one of such episodes occurred after the effective date of this part and the last of which occurred within five years after the commission of a prior episode of racketeering conduct.[3]

Violation of the RICE Act is a second degree felony punishable by up to 15 years imprisonment, a fine of $10,000, and forfeiture of all property associated with the racketeering enterprise.

Defendants first contend the RICE Act, patterned after the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 through 1968 (1984) (the RICO Act), was enacted to prevent the infiltration of organized crime into Utah. Therefore, defendants argue, the RICE Act should extend only to cases involving offenses committed by organized crime.

■ Although the legislative histories of both the RICE and RICO Acts suggest they were intended to apply to persons engaged in acts traditionally associated with organized crime, a nexus to organized crime was not included as an element of the offense. The United States Supreme Court concluded that the RICO Act applies to "any person" who engages in conduct the Act forbids. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Similarly, we hold Utah's RICE Act is not limited in application to persons affiliated with organized crime.

■ Defendants contend that not limiting application of the RICE Act to serious and aggravated offenses by organized crime renders the Act unconstitutionally vague. Vagueness is a question of procedural due process, namely "whether the statute adequately notices the proscribed conduct." *State v. Frampton,* 737 P.2d 183, 192 (Utah 1987). Defendants claim without requiring that the conduct proscribed demonstrate characteristics traditionally associated with organized crime, the RICE Act does not specifically define for persons of ordinary intelligence the outer perimeter of acceptable conduct. *State v. Owens,* 638 P.2d 1182, 1183 (Utah 1981). The RICE Act proscribes the use of proceeds derived from a pattern of racketeering activity in an enterprise. Under the statute, "enterprise," "racketeering activity," and "pattern of racketeering activity" are all clearly defined. "Episode" is defined in Utah Code Ann. § 76–1–401 (1978). We hold that the RICE Act is "sufficiently explicit to inform the ordinary reader what conduct is prohibited," and is therefore not unconstitutionally vague. *State v. Theobald,* 645 P.2d 50, 51 (Utah 1982).

Under section 76–10–1602(1)(h), bribery was included as an act of racketeering, sometimes referred to as a predicate act.[4] Defendants argue that using commercial bribery, a class B misdemeanor punishable by up to six months in jail and a fine of up to $299, to satisfy the RICE Act requirement of predicate offenses violates the constitutional restraint against disproportionate punishment. In reviewing a claim of disproportionate punishment, the question is "whether the sentence imposed in proportion to the offense committed is such as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances." *State v. Hanson,* 627 P.2d 53, 56 (Utah 1981) (quoting *State v. Nance,* 20 Utah 2d 372, 438 P.2d 542, 544 (1968)).

■ Defendants' argument ignores the additional elements required under the RICE Act, i.e., a pattern of racketeering activity, existence of an enterprise, and use

---

**3.** In 1987, the state legislature substantially revised the RICE Act and renamed it the "Pattern of Unlawful Activity Act." After the 1987 revision, "at least three episodes of unlawful activity" are now required.

**4.** After the 1987 revision, section 76–10–1602 now lists the several statutory types of bribery individually, including commercial bribery under section 76–6–508.

of proceeds derived from the racketeering activity to establish, acquire, or operate the enterprise. Defendants claim these elements are illusory. We disagree. It is not the commercial briberies that are being punished in the present case, but the broader conduct which is forbidden by the RICE Act. *Cf. United States v. Field,* 432 F.Supp. 55 (S.D.N.Y.1977), *aff'd* 578 F.2d 1371 (2nd Cir.1978), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978) (Congress entitled to make pattern of racketeering an independent criminal offense punishable more severely than simply twice the penalty for each constituent offense). We do not find defendants' sentences for the RICE violations unconstitutionally "shocking."

Defendants also argue the use of misdemeanors as predicate acts under the RICE Act is inconsistent with Utah's habitual criminal statute, Utah Code Ann. § 76–8–1001 (1978), and the enhancement provision of the Utah Controlled Substances Act, Utah Code Ann. § 58–37–8(1)(b)(iii) (1987). Under section 76–8–1001, upon proof that a person has been twice convicted, sentenced, and committed for a felony, one of which is at least of the second degree, the person may be sentenced as a habitual criminal for a period of five years to life. Under section 58–37–8(1)(b)(iii), upon a second conviction for production or distribution of a controlled substance, a class A misdemeanor, a person is guilty of a third degree felony.

■■■ The RICE Act is not inconsistent with these criminal provisions. The RICE Act does not simply punish multiple violations of statutes prohibiting the acts enumerated in section 76–10–1602(1). Instead, the RICE Act punishes participation in a pattern of racketeering activity bearing the required relationship to an enterprise. *See* subsections 76–10–1603(1) through (4).

Finally, defendants argue the evidence at trial failed to establish a pattern of racketeering activity. "Pattern of racketeering activity" was defined in section 76–10–1602(4) as "at least two episodes of racketeering conduct which have the same or similar objectives, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events...." Defendants claim the several counts of bribery of which they were convicted were, as a matter of law, part of only a single episode of racketeering conduct and thus cannot establish a pattern. In support of their argument, defendants cite several federal cases involving civil claims under the RICO Act. The federal definition of a pattern of racketeering activity differs significantly from the definition of the same term in section 76–10–1602(4).[5] Federal cases which elaborate on the federal definition of "pattern of racketeering activity" are, however, helpful in our analysis.

Federal case law after *Sedima* has attempted judicially to refine the definition of "pattern of racketeering activity" of the RICO Act. Those cases have emphasized the concepts of "continuity plus relatedness" discussed in *Sedima*. Against this backdrop, some federal courts have fashioned requirements that there be "multiple

---

5. 18 U.S.C. § 1961(5) defines "pattern of racketeering activity" as "at least two *acts* of racketeering activity...." This definition has been the subject of considerable judicial attention following the landmark United States Supreme Court decision in *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). In its now famous footnote 14, the Court noted the lack of specificity in the federal definition of pattern of racketeering activity. After a brief discussion of suggestions in the legislative history that "pattern" connotes "continuity plus relationship" rather than merely an enumeration of acts, the Court observed:

   Significantly, in defining "pattern" in a later provision of the same bill, Congress was more

enlightening: "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act.

105 S.Ct. at 3285. The pattern definition noted by the Supreme Court is substantially identical to the definition contained in the RICE Act. Thus, the pattern analysis under the RICE Act does not operate from the same sparse language of the RICO Act.

schemes" or "multiple criminal episodes" rather than several acts to accomplish a single criminal objective in order to establish a pattern of racketeering activity.

The case of *Torwest DBC, Inc. v. Dick,* 628 F.Supp. 163 (D.Colo.1986), cited by defendants, alleged multiple acts of mail/wire fraud in connection with a single scheme to defraud. The district court held that no pattern existed where the defendants' conduct had a single purpose, a single result, one set of participants, a single victim, and one method of commission. The district court thus concluded there was "no continuity and, therefore, no pattern of racketeering activity." *Id.* at 166. The Tenth Circuit Court of Appeals affirmed, but differentiated the case from one where "the RICO claim is based on one scheme involving one victim, but the plan contemplates open-ended fraudulent activity and does not have a single goal that, when achieved, will bring the activity to an end." *Torwest DBC, Inc. v. Dick,* 810 F.2d 925, 929 (10th Cir.1987). Other federal courts have noted that an ongoing scheme involving the same perpetrators, victims, and method of commission may in itself demonstrate a sufficient pattern of racketeering activity. See *Thompson v. Wyoming Alaska, Inc.,* 652 F.Supp. 1222, 1227–28 (D.Utah 1987); *Temporaries, Inc. v. Maryland National Bank,* 638 F.Supp. 118, 123 (D.Md.1986) ("A more flexible and accurate approach to identifying patterns may be to require either 1) more than one scheme or 2) an open-ended continuous scheme which contains a multiplicity of predicate acts.").

We conclude the RICE Act's definition of pattern requires separate but related criminal episodes as the basis for a pattern. We also conclude that the facts of the case before us satisfy the requirement of separate but related criminal episodes suggested by the federal cases and implicit in the definition of pattern of racketeering activity contained in section 76–10–1602(4). Defendants were each charged with seven different bribes paid in approximately two week intervals between February and May 1983. An episode is defined in section 76–1–401 as "all conduct which is closely relat-ed in time and is incident to an attempt or an accomplishment of a single criminal objective." The trial court instructed the jury as follows:

If you should find one or more of the defendants guilty of bribery, you must then determine whether the seven identified payments constitute seven separate bribes, or a series of payments on a single bribe. If you find beyond a reasonable doubt that each of the payments was made with a distinct and separate purpose, then there are separate bribes. On the other hand, if the evidence does not convince you beyond a reasonable doubt that the payments were made with different purposes, then such payments constitute one bribe.

Defendants argue the seven payments were in furtherance of a single criminal objective and therefore constituted a single episode. Determining the existence of a single offense or multiple offenses is a question of intent to be determined by the particular facts and circumstances of each case. *State v. Kimbel,* 620 P.2d 515, 518 (Utah 1980). Although the overall scheme was to maintain defendants' exclusive contract with UP & L, there was evidence to support the jury's finding a separate purpose for each bribe, i.e., Fletcher's hiring of defendants' company before execution of a contract, his recommendations to UP & L management, and his refusal to consider other bids. The fact the jury convicted defendants on only five of the seven bribery counts indicates they considered the facts and circumstances of each payment individually and made a determination as to each. As there is evidence to support the jury's findings, we will not disturb them on appeal. *Garcia,* 744 P.2d at 1030.

Defendants' convictions of violations of the RICE Act are affirmed.

*Miscellaneous Issues*

Defendants also argue their bribery convictions should be reversed because the trial court erred in not instructing the jury that an illegal bribe must be paid with criminal intent. The trial court instructed the jury as follows:

Before you can convict any defendant for bribery you must find beyond a reasonable doubt each and every one of the following elements:

(1) That the defendant or defendants in Salt Lake County, State of Utah;

(2) On or about the date or dates alleged in the Information;

(3) That the defendant or defendants conferred, offered or agreed to confer upon L. Brent Fletcher a benefit;

(4) That this benefit was conferred or offered with the purpose of influencing the conduct of Mr. Fletcher in relating to the affairs of Utah Power and Light contrary to the interests of Utah Power and Light and without its consent;

(5) That the defendant or defendants offered or conferred or agreed to confer the benefits, if any, knowingly, intentionally or willfully as those terms are defined in these instructions.

We believe the instruction sufficiently advised the jury on the law. Both the statute and the instruction implicitly require a criminal intent by requiring a showing of conduct contrary to the interests of and without the consent of the employer or principal. *See State v. O'Neill,* 103 Wash.2d 853, 700 P.2d 711 (1985). Defendants' convictions of bribery are affirmed.

Defendants next argue the trial court made prejudicial errors in the admission of certain evidence. Even assuming the trial court did err, defendants have failed to show the challenged evidence had a substantial influence in bringing about the verdict. Therefore, the errors, if any, were not prejudicial. Utah R.Evid. 103; *State v. Velarde,* 734 P.2d 440, 448 (Utah 1986).

Finally, defendants argue the trial court erred in not granting a mistrial after two witnesses mentioned the Fletcher trial and one juror told the court she had read of Fletcher's conviction in the newspaper during the trial. With regard to motions for mistrial, the Utah Supreme Court has stated:

The critical inquiry should be whether there is a reasonable likelihood that the incident so prejudiced the jury that in its absence there might have been a different result. Due to his advantaged position and consistent with his responsibilities as the authority in charge of the trial, the inquiry is necessarily addressed to the sound discretion of the trial court. He should view such an episode in the light of the total proceeding, and if he thinks that there has been such prejudice that there is a reasonable probability that the defendant cannot have a fair and impartial determination of his guilt or innocence, he should of course grant a mistrial. But inasmuch as this is his primary responsibility, when he has given due consideration and ruled upon the matter, this court on review should not upset his ruling unless it clearly appears that he has abused his discretion.

*State v. Hodges,* 30 Utah 2d 367, 517 P.2d 1322, 1324 (1974) (footnote omitted).

Defendants have failed to show any clear abuse of the trial court's discretion. The trial court and counsel both questioned the juror. The juror indicated the fact of Fletcher's conviction had no impact on her deliberations and was not discussed with the other jury members. Furthermore, the trial court adequately instructed the jury to only consider the evidence introduced at trial. The denial of defendants' motion for a mistrial is affirmed.

The jury verdict on all counts is affirmed.

DAVIDSON, J., concurs.

ORME, Judge (dissenting in part):

While I otherwise fully concur in the majority opinion, I disagree with the result reached and portions of the analysis in the section entitled "Antitrust and 'Group Boycott'."

As the majority states, there are three elements of the antitrust offense as charged in this case: (1) a contract, combination or conspiracy in restraint of trade; (2) in the form of a group boycott; and (3) with specific intent to eliminate competition. I simply do not believe that these elements have been met. My disagreement

with my colleagues is quite complete. I believe defendants' conduct constituted simple commercial bribery. I believe their conduct can in no way be properly characterized as a group boycott. I believe the evidence shows defendants' intent was strictly to line their own pockets and not, in any sense, to eliminate competition.

## COMMERCIAL BRIBERY

I do not view Utah's antitrust statute as the appropriate vehicle for bringing commercial bribery charges. In addressing this issue, the trial court properly recognized the Robinson–Patman Act as the vehicle under which federal commercial bribery charges are typically brought.[1] The court interpreted the Legislature's failure to incorporate the Robinson–Patman Act as evidencing an intent to make Utah's antitrust statute the appropriate vehicle for charging commercial bribery. I believe the fairer interpretation is that the Legislature deliberately failed to incorporate a Robinson-Patman-type act into our antitrust statute because it recognized that Utah already has a specific vehicle for prosecuting commercial bribery, namely the commercial bribery statute. Utah Code Ann. § 76–6–508 (1978).

Even assuming that commercial bribery is properly charged under the Utah antitrust statute, the majority concedes the bribery must be coupled with other acts intended to restrain trade in order to establish a violation. While the majority recognizes the principle that commercial bribery, without more, does not violate the antitrust laws, it only offers Fletcher's unilateral refusal to accept proposals from other security companies as the "more" which is necessary to turn an otherwise garden-variety bribe into an antitrust violation. However, any agreement to deal exclusively with one party necessarily involves a refusal to deal with other parties. *See, e.g., Construction Aggregate Trans. v. Florida Rock Ind. Inc.*, 710 F.2d 752, 776 (11th Cir.1983) (every exclusive dealing arrange-

ment necessarily involves the exclusion of an entity which operates on the same market level). At least absent evidence of other illegal conduct, the defendants' payment of bribes did not constitute a contract, combination, or conspiracy in violation of the antitrust statute. Fletcher's refusal to engage the services of defendants' competitors was merely the bargained for object of the bribes in question. Under the majority's view—notwithstanding the claim that more than a typical commercial bribe is required—essentially every commercial bribe would be an antitrust violation if only the payee performed his or her end of the bargain.

## GROUP BOYCOTT

As the majority observes, under § 76–10–920 of the Utah Antitrust Act, only four specific antitrust violations, "clearly labeled as per se violations of the Sherman Act," are criminal offenses in Utah. Defendants in this case were charged with having committed only one such violation, namely a group boycott. As the majority states, the Legislature intended that federal interpretations be considered in construing the Utah statute where appropriate. However, unlike the Sherman Act, the Utah statute was designed to unambiguously define antitrust violations which will give rise to criminal sanctions in this state. *See* Dibble & Jardine, *The Utah Antitrust Act of 1979: Getting Into the State Antitrust Business*, 1980 Utah L.Rev. 73, 83. The majority concedes that the agreement between defendants and Fletcher did not constitute a classic group boycott under the federal definition and that "unless defendants' conduct was in the form of a group boycott, it was not criminal under Utah law."

Notwithstanding the specific language of the statute dictating the use of federal interpretations and the objective of clearly delineating proscribed conduct, the majority suggests that the Utah statute rejects the traditional federal definition of the

---

**1.** Section 2(c) of the Robinson–Patman Act, 15 U.S.C.A. § 13(c) (1973), expressly makes accepting a "commission" without performing real work in connection with a sale of goods illegal under federal law.

term "group boycott" in favor of the "general definition of boycott."[2] This concept, according to the majority, refers to "a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target."[3] Even under this definition, it is difficult to imagine how the behavior of these defendants constitutes any kind of boycott with antitrust implications. Fletcher accepted bribes from the defendants in this case so that they would receive the UP & L security contracts. There was no dispute, no pressure, no enlistment of others to withhold services, and no target for elimination. It is clear to me that even if the Legislature meant to have the term "group boycott" construed in a less rigid way than might characterize the traditional federal view, it nonetheless intended to have the term mean something reasonably concrete. Minimally, the behavior sought to be proscribed by the statute is behavior which can fairly be described as a group boycott.

In my view, what defendants did cannot be characterized as a group boycott in any sense. Defendants' excursion into the realm of antitrust was, at most, in the form of an exclusive dealing arrangement. An exclusive dealing arrangement is a contract which involves a commitment by a buyer to deal only with a particular seller. L. Sullivan, *Handbook of the Law of Antitrust* 471 (1977). However, such an arrangement does not constitute a per se violation of section 1 of the Sherman Act, *see, e.g., Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1304 n. 9 (9th Cir.1982) (explaining *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)), nor does it constitute a violation of § 76–10–920 of the Utah Antitrust Act.

The trial court accurately categorized the arrangement between Fletcher and the defendants in this case as one of "exclusive dealing," while at the same time stating that application of "rule of reason" analysis[4] "would result in an unconstitutional deprivation of defendant's rights to due process of law."[5] The majority likewise

**2.** The majority relies on federal cases rejecting the "numerosity" requirement of group boycott for the view that something less is now needed to constitute a group boycott. While it is true that these cases have dropped the "numerosity" requirement, i.e., concern about the number of conspirators in a horizontal relationship, they nonetheless still require the other elements of a group boycott: concerted refusal to deal, enlistment of others, and a target. *See, e.g., Com–Tel, Inc. v. Oukane Corp.*, 669 F.2d 404, 414 (6th Cir.1982).

**3.** The majority suggests that a boycott under their "general definition" differs from the term group boycott as it evolved under the per se doctrine. Ironically, their definition was taken from one of the landmark cases defining a per se illegal group boycott. The definition extracted from the Supreme Court's opinion was one which the Court offered to explain the term "boycott" in common parlance. *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 545–46, 98 S.Ct. 2923, 2932, 57 L.Ed.2d 932 (1978).

**4.** Whereas group boycotts are subject to a per se rule of illegality, exclusive dealing arrangements are tested by a "rule of reason" standard. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d at 1302. The focus of this test is to first find a relevant market and then assess whether competition has been foreclosed in a substantial share of the relevant market. Antitrust liability is not imposed without proof of

actual harm to competition. The purpose of this test is to determine the anticompetitive "effects" of the exclusive contract, *id.*, rather than the anticompetitive "intent" as required by the Utah statute.

**5.** The memorandum decision is reprinted at Note, *Criminal Antitrust Action in Utah: State v. Fletcher*, 1 B.Y.U.J.Pub.L. 229, 251–55 (1986). The decision was written in the context of a denial of a motion to dismiss. While the decision simply permitted the state to proceed to try its case before a jury, the trial court shared the majority's view that intent is the controlling element of a "group boycott" charge.

The theme of the cases cited by both parties is that the mere existence of an exclusive vertical contract is not a "group boycott" prohibited by the antitrust laws. However, the State has alleged and should be allowed to prove that the defendants had specific anticompetitive intent. This can not be inferred from the mere existence of an exclusive vertical deal, but by anticompetitive, illegal behavior an otherwise legal business decision can become an unlawful group boycott under the Utah Antitrust Act. The State should have the opportunity to establish that the defendants had a specific intent to eliminate access to the security guard market as the goal of their exclusive dealing and that no legitimate business purpose or result was intended.

admits that "the rule of reason has no part in the criminal provisions of the Utah Antitrust Act."

The majority, however, largely avoids the implications of this conclusion by minimizing the nature of defendants' *behavior* and instead emphasizing their perceived state of mind in doing what they did. According to the majority, "the intent of the contract, combination or conspiracy is the deciding element" of criminality. Under this reasoning, even a purely vertical exclusive dealing contract—which both the majority and the trial court acknowledge is not a "group boycott" in the usual sense— can be miraculously converted into a group boycott, at least of the Utah variety, by proof of an anticompetitive intent. That is, as the trial court held, "an otherwise legal business decision can become an unlawful group boycott under the Utah Antitrust Act."

The effect of this approach is to render totally ineffectual the Legislature's effort to particularize but four familiar, per se antitrust violations as unlawful under § 76–10–920, so that "both the prosecutor and the community at large" will clearly know "what *conduct* is criminally proscribed." Dibble & Jardine, *The Utah Antitrust Act of 1979: Getting Into the State Antitrust Business*, 1980 Utah L.Rev. 73, 83 (emphasis added).

But why else, the logic goes, would the Legislature inject a specific intent requirement into an offense which has historically been thought so bad that criminal intent can simply be presumed? It is obvious to me that by coupling an anticompetitive specific intent requirement with the group boycott aspect of § 76–10–920, the Legislature did not mean to obscure the issue of what kinds of behavior were proscribed. Rather, the Legislature meant to avoid the "confusion over the illegality of group boy-

cotts and the governing standards," *id.*, by requiring that a readily identifiable group boycott be accompanied by an actual intent to eliminate competition. *See id.* The specific intent requirement was added to eliminate "the potentially problematic situation where a group boycott exists but an anticompetitive motive does not." *Id.* The requirement was not added to allow for a criminal conviction whenever there is an anticompetitive motive regardless of whether there is really a group boycott. I believe by adding a specific intent requirement the Legislature meant to narrow, not expand, the scope of the group boycott crime in this state.

## SPECIFIC INTENT

Even if the defendants engaged in conduct which might arguably constitute a group boycott in some broad sense, I do not believe they did so with the specific intent to eliminate competition as required by the statute nor do I agree with the majority that such intent can be inferred from the evidence.

According to the majority, anticompetitive intent "may be inferred from the defendant's conduct and circumstances." The majority points to the fact that the contracts between UP & L and defendants were not competitively bid as is the usual practice in selecting security companies. This leads my colleagues to the conclusion that the intent of these defendants was none other than to eliminate "competition."

If one looks at what defendants did and considers the market in which they did it,[6] it is obvious they had no intent to eliminate competition. The trial court, in instructing the jury, narrowly defined the relevant market in this case as "among vendors of security guard services to Utah Power and Light," notwithstanding the fact that other security guard companies competing for

*Id.* at 254–55.

6. "[A]n antitrust policy divorced from market considerations would lack any objective benchmarks." *Continental T.V. Inc. v. GTE Sylvannia, Inc.*, 433 U.S. 36, 53 n. 21, 97 S.Ct. 2549, 2559 n. 21, 53 L.Ed.2d 568 (1977). Contrary to the majority's characterization, I have not urged full-blown market analysis of the sort typical when applying the rule of reason. Such analysis is indeed unnecessary where an antitrust violation of the per se variety is at issue. However, I think a cursory peek at the relevant market is instructive in evaluating the likelihood that defendants had as their intent the elimination of competition.

the UP & L contract were also competing for contracts throughout the state, or even worldwide. However, there was no evidence that the security needs of UP & L were somehow so unique that guard service vendors competing for UP & L's business were necessarily different—and fewer—than guard service vendors generally, who of course are able to provide security services for everything from large utilities to retail stores, apartments, warehouses, churches, banks, and so on. Nor was there evidence to show that UP & L was such a major purchaser in the local security service market that failure to secure that contract would necessarily imperil any of defendants' competitors.

While it can perhaps be inferred that the defendants intended to eliminate other security companies from competition for the UP & L contract, it simply cannot be inferred that they intended to eliminate these companies from competition in any meaningful marketplace, which is what the antitrust laws are designed to prevent. "The Sherman Act was enacted to protect competition in the marketplace. It was not designed, and has never been interpreted, to reach all business practices, unfair or otherwise, damaging to individual companies." *Cascade Cabinet Co. v. Western Cabinet & Millwork*, 710 F.2d 1366, 1374 (9th Cir.1983). Other security companies were not hindered by defendants in competing for security guard contracts. They were merely deprived of the UP & L contract. While this conduct is certainly not commendable,[7] "the use of unfair means resulting in the substitution of one competitor for another without more does not violate the antitrust laws." *Manufacturing Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1043 (11th Cir.1982).

## CONCLUSION

Commercial bribery does not criminally violate the Utah antitrust laws. Defend-

ants' conduct does not constitute a group boycott. Even if defendants' conduct can somehow be shoehorned into the "group boycott" pigeonhole, there was no evidence to prove a specific intent to eliminate competition, and the fair inferences point the other way. I would reverse the antitrust convictions and remand for resentencing on the other crimes for which defendants were properly convicted.

---

7. Fortunately, such objectionable conduct is readily punished under our commercial bribery statute. Where the conduct is especially egregious, it can also, as in this case, be reached under the racketeering statute. Defendants did a bad thing and they should suffer the conse-

quences. Their punishment, however, should be for the crimes they committed, not those they might have committed had the Legislature chosen a different approach to antitrust criminality.