STATE of Utah, Plaintiff and Appellee,

v.

Keeley Laursen ROWE, Defendant
and Appellant.

No. 890396–CA.

Court of Appeals of Utah.

Feb. 8, 1991.

Shelden R. Carter (argued), Harris, Carter & Harrison, Provo, for defendant and appellant.

R. Paul Van Dam, Atty. Gen., Christine F. Soltis (argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

Before GARFF, JACKSON and ORME, JJ.

## OPINION

ORME, Judge:

Defendant appeals her conviction of possession of a controlled substance, a third degree felony, in violation of Utah Code Ann. § 58–37–8(2)(a)(i), (b)(ii) (1989). We reverse.

## FACTS

On October 7, 1988, a search warrant was issued and executed which authorized police to search for narcotics in the residence of Stan Swickey in Leeds, Utah. The warrant contained provisions which allowed police to enter "day or night," and to effect the search without notice, i.e., on a "no-knock" basis. The warrant was issued based on information in the officer's supporting affidavit that a confidential informant had been contacted by Swickey, who told the informant that he, Swickey, had picked up a quantity of methamphetamine and marijuana that was being stored at his home in Leeds. The affidavit in support of the warrant contained preprinted language which stated that the affiant reasonably believed that the property sought could be easily destroyed or hidden or that harm to officers could result from notice. Following this language are two boxes that the affiant can check, and which were checked, to request nighttime and "no-knock" authority. No other factual information supports these requests.

The warrant was executed on a "no-knock" basis on October 7, 1988,[1] at approximately 11:30 p.m. When police entered Swickey's apartment, they found eight people, in addition to Swickey, in the home. Everyone except defendant was in the living room playing cards around a table. Defendant was in the kitchen. After securing the home, the officers had defendant join the other people in the living room, while Swickey was taken into the kitchen and placed under arrest, pursuant to an arrest warrant, and advised of the search warrant. Another individual was arrested when the officers saw drugs nearby, in plain view. The remaining individuals, including defendant, were told they could leave the premises. Defendant did not have her shoes, and asked if she could go to the bedroom to retrieve them. An officer accompanied her to the room, where she took the shoes from a pile of items.

---

1. While the date on the search warrant and supporting affidavit is October 8, 1988, it is clear from trial testimony that this was an error, and the date of issuance was actually October 7.

The officer asked her if she had everything that was hers from that room. Defendant replied that she did.

After defendant left, the officers conducted a search of the home. Narcotics were found throughout the house. A purse was seized from the pile in the bedroom from which defendant had retrieved her shoes. Inside the purse was a small brown vial which contained methamphetamine. Also in the purse were several documents that revealed that the purse belonged to defendant.

Police contacted defendant the next day and advised her that they had a purse that belonged to her. She came down to the station and was arrested. After being advised of her *Miranda* rights, defendant admitted that the purse and vial of drugs were hers. She told police that she had been "ripping off" drugs from Swickey.

Prior to trial, defendant filed a motion to suppress the vial and other contents seized from her purse. The motion was accompanied by a memorandum of points and authorities. The state filed a memorandum opposing defendant's motion to suppress, and requested a ruling on defendant's motion. On March 17, 1989, the court issued a written order denying defendant's motion.

Defendant waived her right to a jury trial, and a bench trial commenced on March 21, 1989. During the trial defendant again renewed her motion to suppress. The basis of her argument was that the search warrant was defective since the supporting affidavit did not support the nighttime or "no-knock" authorization. The state argued that "Mr. Swickey would be the only one to have standing to object to that," and also argued the merits of the claim. The court denied the renewed motion. Defendant was convicted as charged.

Defendant raises three issues on appeal, all of which challenge the district court's failure to suppress the items seized from defendant's purse: 1) Whether there was sufficient factual information in the supporting affidavit to authorize a nighttime search, 2) whether there was sufficient factual information in the supporting affidavit to authorize a "no-knock" search, and 3) whether the search was defective since the warrant was dated subsequent to the search.[2]

## "NO–KNOCK" SEARCH

■ Defendant argues there was insufficient factual information presented in the supporting affidavit to justify the inclusion of a "no-knock" provision in the search warrant. Utah Code Ann. § 77–23–10 (1990) provides, in pertinent part, as follows:

> When a search warrant has been issued authorizing entry into any building, room, conveyance, compartment or other enclosure, the officer executing the warrant may use such force as is reasonably necessary to enter:
>
> . . . .
>
> (2) Without notice of his authority and purpose, if the magistrate issuing the warrant directs in the warrant that the officer need not give notice. The magistrate shall so direct only upon proof, under oath, that the object of the search may be quickly destroyed, disposed of, or secreted, or that physical harm may result to any person if notice were given.

The affiant in this case requested a warrant to search for narcotics believed located in a residence, by checking a preprinted provision on the affidavit form. A "no-knock" warrant was requested based on the affiant's statement that such narcotics could be easily destroyed. Defendant argues that this statement alone is insufficient to justify issuance of a "no-knock" warrant. However, reading the affidavit "in a common sense manner and as a whole," *State v. Paul*, 225 Neb. 432, 405 N.W.2d 608, 610 (1987) (quoting *People v. Mardian*, 47 Cal.App.3d 16, 35, 121 Cal. Rptr. 269, 281 (1975)), we conclude that the

---

**2.** Defendant addresses the third contention in a cursory, one paragraph argument. She cites no authority for her position that the erroneous date invalidates the warrant, nor does she respond to testimony given at trial that the date the warrant was issued was actually October 7, 1988. We therefore decline to address this issue.

magistrate had sufficient basis to issue a "no-knock" warrant.

Although the affidavit is sparse, it is clear that the object of the search was drugs located in a residence. The small amount of drugs ordinarily found in a residential setting can be easily and quickly destroyed with even the briefest notice. Therefore, issuance of a "no-knock" warrant is justified if the affidavit suggests that a small, readily disposable, quantity of drugs in a residence is the object of the search.[3] The magistrate can readily and properly infer that such drugs could be quickly destroyed if notice is given. *State v. Spisak*, 520 P.2d 561 (Utah 1974); *State v. Miller*, 740 P.2d 1363 (Utah Ct.App. 1987). While a detailed and factually specific affidavit is commendable and may facilitate subsequent review by an appellate court, it is not strictly necessary for the officer to elaborate on the obvious in the affidavit.

## NIGHTTIME SEARCH

■ Defendant also argues that the supporting affidavit lacked sufficient factual information to support a nighttime search. Utah Code Ann. § 77–23–5(1) (1990) provides in pertinent part:

The magistrate must insert a direction in the warrant that it be served in the daytime, unless the affidavits or oral testimony state a reasonable cause to believe a search is necessary in the night to seize the property prior to it being concealed, destroyed, damaged or altered, or for other good reason; in which case he may insert a direction that it be served any time of the day or night.

Previous Utah case law on this issue construed a different code provision which required that a warrant be served in the daytime "unless the affidavits are positive that the property is on the person or in the place to searched." Utah Code Ann. § 77–54–11 (1953). *See, e.g., State v.*

*Treadway*, 28 Utah 2d 160, 499 P.2d 846, 848–49 (1972). No Utah cases are drawn to our attention which have addressed the present code provision.

The showing required by the present statute focuses not upon a positive showing that the property is at the place to be searched, but upon whether there are special circumstances which would justify a search at night. The statute does not specify how elaborate or detailed this showing must be, but merely requires that the "affidavits or oral testimony" must support a "reasonable cause" determination that a nighttime search is necessary. The precise quantum of information which would support this determination is not defined in the statute or in Utah case law and, as has been observed elsewhere, it is difficult "to anticipate all of the numerous factors that may justify the authorization of a nighttime search." *People v. Kimble*, 44 Cal.3d 480, 749 P.2d 803, 810, 244 Cal.Rptr. 148, 155, *cert. denied*, 488 U.S. 871, 109 S.Ct. 188, 102 L.Ed.2d 157 (1988). Nonetheless, the statute clearly requires a particularized showing either that 1) a search is required in the night because the property is on the verge of being "concealed, destroyed, damaged, or altered," or 2) "for other good reason." Utah Code Ann. § 77–23–5(1) (1990).

Defendant argues that this particularized showing was not made in this case. We agree. Nothing in the supporting affidavit supported the inclusion of the nighttime service authority other than the preprinted language referred to above and the information received from the confidential informant. Contrary to our view that little more is required to justify a "no-knock" warrant than that the search is for narcotics at a residence, we see nothing inherent in a narcotics search which would necessitate a search at night, even though circumstances can easily be imagined which would suggest the propriety of such a search

---

**3.** A more particularized showing may well be required if, for example, a large quantity of drugs is sought. In such cases, as where the

affiant has information of the on-going cultivation or manufacture of drugs, the exigency of

being made at night.[4]

In interpreting a similar statutory provision which allows a magistrate to authorize a nighttime search upon a showing of "good cause," one appellate court observed:

> (1) A magistrate cannot make a neutral and independent determination of whether authorization of nighttime service is necessary when faced with only conclusory and ambiguous allegations in the affidavit; and (2) an affiant's averment that in his experience (generally) particular types of contraband are easily disposed of does not, in itself, constitute a sufficient showing for the necessity of a nighttime search: a particular and specific reason for nighttime service must be set forth.

*People v. Mardian,* 47 Cal.App.3d 16, 34, 121 Cal.Rptr. 269, 281 (1975).

In *Mardian,* the court held that the magistrate had "good cause" to issue a nighttime search warrant based on information provided in the affidavit that the contraband was in the process of being removed from the premises, and that the occupants would be able to remove the remainder of the contraband before a daytime warrant could be served since the occupants would be leaving at 6:00 a.m. *Id.* 121 Cal.Rptr. at 282. *See also Kimble,* 749 P.2d at 810, 244 Cal.Rptr. at 155 (magistrate could infer that persons who had recently stolen stereo equipment would attempt to get rid of it quickly, since the theft was tied to a double homicide); *State v. Paul,* 225 Neb. 432, 405 N.W.2d 608 (1987) (affiant's statement that he smelled a strong odor of burnt marijuana coming from inside the residence in the afternoon supported an inference that marijuana was being consumed and thus destroyed). *See generally* Annotation, *Propriety of Execution of Search Warrant at Nighttime,* 26 A.L.R.3d 951 (1969 & Supp. 1990), 1 C. Torcia, *Wharton's Criminal Procedure* § 166 (13th ed. 1989); 2 W. LaFave, *Search and Seizure* § 4.7(b) (2d ed. 1987 & Supp.1990).

The affidavit in this case contained no facts from which a magistrate could infer that the contraband was likely to be destroyed, concealed, damaged, or altered during the night. Additionally, we find nothing in the affidavit from which a magistrate could reasonably infer that there was any "other good reason" to justify issuance of a nighttime search warrant.[5] We therefore hold that it was error for the

---

ready destructability, inherent with small quantities of drugs, may not be present.

**4.** For example, if the supporting affidavit made a particularized showing that drugs were likely to be sold or consumed over the course of the night and evidence thereby lost, or that the supply was likely to be imminently moved en masse to a different location during the night, or that a safer search was likely at night because the house was abustle with activity during the day and no one but the occupant was likely to be home at night, then the propriety of a nighttime search becomes manifest. We caution that a mere incantation of such circumstances will not justify a nighttime search—the required factual showing is not one which is conducive, for example, to preprinted language. Officers must "state a reasonable cause to believe a [nighttime] search is necessary. . . ." Utah Code Ann. § 77–23–5 (1990).

**5.** Though we find it unnecessary to define what "other good reason" might encompass, *but see* note 4, *supra,* clearly one reason why a nighttime search might be authorized is where a nighttime search would increase the safety of the officers executing the warrant or the safety of the general public.

Of course, ordinarily a nighttime search would pose a heightened safety risk since people may tend to overreact to an entry by force in the dead of night. Darkness may exacerbate the reaction or heighten the confusion inherent in a search, especially one conducted on a "no-knock" basis. Nonetheless, a specific showing that the safety of the public or the officers will be increased has been held a sufficient basis for a search at night. *See, e.g., Kimble,* 749 P.2d at 810, 244 Cal.Rptr. at 155 (magistrate could conclude that permitting police to expedite their investigation was an exceptionally compelling reason to allow a nighttime search where dangerous killer or killers were still at large). We note that other courts have rejected less compelling kinds of "other good reason," such as because "appellant did not get home until '6:00 or after' and that appellant was not always present at his house," *People v. Watson,* 75 Cal.App.3d 592, 595, 142 Cal.Rptr. 245, 246 (1977); because the officer applying for the warrant "was on duty at night," *Wiggin v. State,* 755 P.2d 115, 116–17 (Okla.Crim.App.1988); and because "it [was] unknown when the person described [in the affidavit] will be at the premises." *State v. Lien,* 265 N.W.2d 833, 840 (Minn.1978).

magistrate to authorize a nighttime search based on the facts in the affidavit presented to him.

## STANDING, ABANDONMENT, "GOOD FAITH," AND SUPPRESSION

The state argues that any inadequacy in the warrant is immaterial since 1) defendant has no standing to challenge the adequacy of the warrant to search Swickey's apartment since she was only a guest in the apartment; 2) any expectation of privacy she had in the contents of her purse was abandoned when she told the officer she had everything that was hers when she departed Swickey's bedroom, leaving the purse behind; 3) any technical defects in the warrant were overcome by the officer's good faith reliance on the warrant in conducting the search; and 4) any failure of the warrant to satisfy merely statutory requirements does not necessitate the suppression of evidence, as would be the case where constitutional requirements are offended.

### A.  Standing

■ In her reply brief, defendant claims the state did not raise standing at trial. While we reaffirm that such a failure would be fatal to the state's position, *see State v. Marshall*, 791 P.2d 880, 885–86 & n. 8 (Utah Ct.App.1990), defendant's claim is not borne out by the record. As indicated above, the prosecutor specifically argued that "Mr. Swickey would be the only one to have standing to object to [the nighttime and 'no-knock' provisions of the warrant]."

■ Since the contention was adequately raised at trial, we now address the state's standing argument. The state argues that defendant has no standing to challenge the adequacy of a warrant authorizing the search of a third-party's home since she was only a party guest in the home. We disagree.

Since the decision in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), it has been the law that "capacity to claim the protection of the Fourth Amendment depends ...

upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). A subjective expectation of privacy is legitimate if it is ["]one that society is prepared to recognize as 'reasonable,[' "] *id.* at 143–144 n. 12, 99 S.Ct. at 430 n. 12, quoting *Katz, supra*, at 361, 88 S.Ct. at 516 (Harlan, J., concurring). *Minnesota v. Olson*, —— U.S. ——, 110 S.Ct. 1684, 1687, 109 L.Ed.2d 85 (1990). The state's position that defendant failed to establish standing based on the nature of her presence in Swickey's home is arguable, but not compelling.

In *Olson*, the Supreme Court concluded "that Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id.* 110 S.Ct. at 1688. In this case, the evidence did not establish that defendant was an overnight guest in Swickey's home on the night of the search. There is, however, uncontroverted evidence that defendant had an intimate relationship with Swickey, which may have continued to the time of the incident giving rise to this case, and had stayed overnight in the home on several prior occasions. However, the record lacks facts which would lead to the conclusion that she intended, or might have been invited, to remain overnight on the night of the search.

But as we read *Olson*, there is no talismanic significance, in determining standing, to the length of time a social guest is in the home. *Olson* squarely holds that an overnight guest has such standing, but nothing in *Olson* suggests that a social visit of a duration less than overnight would deprive a guest of standing. While an overnight stay may connote a qualitatively greater expectation of privacy than some social visits, given the typical characteristics of overnight stays such as showering, changing clothes, and the use of toilet facilities, the distinction is really more one of degree than of kind. For example, the seclusion extended to a parent who pauses

to feed or diaper an infant while visiting friends implies a reasonable expectation of privacy, although the visit might be a short one, and certainly less than an overnight stay. Visitors of comparatively short duration may nap, change, use the toilet, or dine without any expectation of interference from the world at large. In this case, defendant felt secure enough in the home to remove her shoes, leave her purse beyond her view, and roam to rooms other than where her fellow guests were playing cards. Eschewing an analysis based on free access and right to exclude others, the *Olson* Court focused on the social tradition that

> hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household.

*Id.* at 1689.

A standing challenge in the search and seizure context is resolved by a determination of "whether governmental officials violated any legitimate expectation of privacy." *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980). We conclude that defendant's status as an invited guest in the home vested her with a reasonable expectation of privacy in the home and she thereby gained sufficient standing to challenge the validity of the search warrant and the resulting search.

### B. Abandonment

■ The state argues that even if defendant might otherwise have standing to challenge the search warrant, she abandoned the purse, and thus abandoned any standing she might otherwise have had to challenge the search which resulted in seizure of her purse. We disagree.

"When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had." *United States v. Thomas*, 864 F.2d 843, 845 (D.C.Cir.1989) (quoting *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.),

*cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983)). However, "abandonment must be distinguished from a mere disclaimer of a property interest made to the police prior to the search, which under the better view does not defeat standing." *United States v. Morales*, 737 F.2d 761, 763–64 (8th Cir.1984) (quoting 3 W. La-Fave, *Search and Seizure* § 11.3, at 548–49 (1978)).

Whether defendant had abandoned her purse, under search and seizure analysis, is primarily a factual question of intent to voluntarily relinquish a reasonable expectation of privacy, which may be inferred from "words spoken, acts done, and other objective facts." *Thomas*, 864 F.2d at 846 (quoting *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir.1973)). *See also Gurgel v. Nichol*, 19 Utah 2d 200, 429 P.2d 47, 48 (1967) (abandonment ordinarily a question for the factfinder to be determined from the facts and circumstances). The burden of proving abandonment falls on the state, *People v. Contreras*, 210 Cal.App.3d 450, 259 Cal.Rptr. 290, 293 (1989), and must be shown by "clear, unequivocal and decisive evidence." *Friedman v. United States*, 347 F.2d 697, 704, (8th Cir.1965). *See also United States v. Boswell*, 347 A.2d 270, 274 (D.C.1975); *O'Shaughnessy v. State*, 420 So.2d 377, 379 (Fla.Dist.Ct.App.1982). It "is measured from the vantage point" of the defendant, and not the police. *Narain v. State*, 79 Md.App. 385, 556 A.2d 1158, 1161 n. 4 (1989). "It is only the [defendant's] state of mind that counts." *Id.*

Defendant was allowed to leave the party along with Swickey's other guests. She was conducted to the bedroom to retrieve her shoes and was given the opportunity to claim any other property belonging to her. When asked by the police officer if anything else belonged to her, she stated that she had retrieved everything in the bedroom that was hers. That repudiation of interest in property located in the bedroom is consistent with a conclusion of abandonment. It is not, however, inconsistent with a conclusion of a mere disclaimer of interest to avoid self-incrimination. The state failed to produce evidence which would de-

velop this issue and perhaps meet its burden of proving abandonment under search and seizure analysis. Accordingly, abandonment in the Fourth Amendment sense was not established by the state.[6]

## C. Good Faith

■ The state further claims the search can be validated by the officer's good faith reliance on the deficient warrant. *United States v. Leon*, 468 U.S. 897, 920–23, 104 S.Ct. 3405, 3419–20, 82 L.Ed.2d 677 (1984). In *Leon*, the Supreme Court held that the

exclusionary rule, aimed at deterring unlawful police conduct,[7] does not bar evidence obtained by officers acting in good faith reliance on a defective warrant.[8] *Id.* But the *Leon* doctrine is not without limitations. When the magistrate reviewing the affidavit in support of the search warrant is not presented with sufficient facts to determine probable cause, the warrant cannot be relied upon by searching officers. *Id.* 468 U.S. at 915, 104 S.Ct. at 3417. We have determined that there was nothing in the affidavit in this case that would offer

---

**6.** It is not entirely clear that even if the state had proven abandonment defendant would be deprived of standing to challenge the seizure of her purse. "Property abandoned as a direct result of an unlawful intrusion into a person's right to be free from governmental interference cannot be lawfully seized." *State v. Nichols*, 563 So.2d 1283, 1286–87 (La.Ct.App.1990). *See also United States v. Roman*, 849 F.2d 920, 923 (5th Cir.1988); *United States v. Tolbert*, 692 F.2d 1041, 1045 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983); *State v. Jones*, 553 So.2d 928, 931 (La.Ct.App.1989); *Narain v. State*, 79 Md.App. 385, 556 A.2d 1158, 1160–61 (1989); *State v. Huether*, 453 N.W.2d 778, 781–82 (N.D.1990); *State v. Whitaker*, 58 Wash.App. 851, 795 P.2d 182, 183 (Wash.Ct.App. 1990). Under this view, even if defendant abandoned her purse, she still would have standing since the abandonment was precipitated by an unlawful search of the residence in which her purse was located.

**7.** Many have questioned the *Leon* Court's narrow interpretation of the exclusionary rule's purpose. *See, e.g., United States v. Leon*, 468 U.S. 897, 928–60, 104 S.Ct. 3430, 3430–45, 82 L.Ed.2d 677 (1984) (Brennan, J., dissenting); *id.* at 960–80, 104 S.Ct. at 3445–56 (Stevens, J., dissenting); *State v. Novembrino*, 105 N.J. 95, 519 A.2d 820, 853–57 (1987); 1 W. LaFave, *Search & Seizure* § 1.3, at 46 n. 5 (1987) (citing extensive critical authority); Wasserstrom & Mertens, *The Exclusionary Rule on the Scaffold: But Was it a Fair Trial?*, 22 Am.Crim.L.Rev. 85, 106–07 (1984). *See also State v. Mendoza*, 748 P.2d 181, 185 & n. 2 (Utah 1987) (criticizing the breadth of the language in *Leon* ). The *Leon* rationale, viewed from a historical perspective, is treated at greater length in the Appendix to this opinion.

**8.** We note that neither party addressed Utah's exclusionary rule, premised on Article I, Section 14, of the Utah Constitution. *See State v. Larocco*, 794 P.2d 460, 472 (Utah 1990) ("exclusion of illegally obtained evidence is a necessary consequence of police violations of article I, section 14."). To date, neither the Utah Supreme Court nor this court has held that a parallel doctrine

to the *Leon* exception would apply in the context of Utah's exclusionary rule. *See State v. Mendoza*, 748 P.2d 181, 187 (Utah 1987) (Zimmerman, J., concurring) (Court has not yet considered *Leon*-type exception under Article I, Section 14, of the Utah Constitution). *See also State v. Thompson*, 751 P.2d 805, 809 (Utah Ct.App.1988) (concluding in dicta that *Mendoza* did not invalidate applicability of *Leon* ). Many state courts have determined that exclusionary rules existing by virtue of state constitutional provisions are not subject to a *Leon*-type "good faith" exception. *See, e.g., State v. Marsala*, 216 Conn. 150, 579 A.2d 58, 68 (1990); *People v. Sundling*, 153 Mich.App. 277, 395 N.W.2d 308, 315 (1986), *appeal denied*, 428 Mich. 887 (1987); *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988); *State v. Novembrino*, 105 N.J. 95, 519 A.2d 820, 857 (1987); *People v. Bigelow*, 66 N.Y.2d 417, 497 N.Y.S.2d 630, 636–37, 488 N.E.2d 451, 457–58 (1985). At least one court has construed a statutory exclusionary rule to reject the *Leon* exception. *See, e.g., Commonwealth v. Upton*, 394 Mass. 363, 370 n. 5, 476 N.E.2d 548, 554 n. 5 (1985).

Notwithstanding any dicta to the contrary in our decision in *State v. Thompson*, 751 P.2d 805, 809 (Utah Ct.App.1988), it is far from clear whether the *Leon* exception has any vitality under a state law analysis, especially since the basis and scope of our state exclusionary rule is somewhat unsettled. *See State v. Larocco*, 794 P.2d 460, 472–73 (Utah 1990). There may well be sound reasons for state court interpretation at variance with the federal search and seizure rules. *See generally*, Durham, *Employing the Utah Constitution*, 2 Utah B.J. 25 (Nov.1989); *State v. Larocco*, 794 P.2d 460 (Utah 1990); *State v. Watts*, 750 P.2d 1219, 1221 n. 8 (Utah 1988). *See also State v. Larocco*, 742 P.2d 89, 104–05 (Utah Ct.App.1987) (Billings, J., concurring and dissenting) ("[s]tate courts responding to the confusing and restrictive new federal interpretations are relying on an analysis of their own search and seizure provisions to expand constitutional protection beyond those mandated by the fourth amendment, often directly avoiding applicable United States Supreme Court precedent").

any basis to the magistrate for a finding of probable cause to allow a nighttime search. It appears from the record that the endorsement of the nighttime authorization was done in impermissible "rubber stamp" fashion. *See Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964).

The question of the officer's good faith reliance is subject to de novo determination by this court. *United States v. Freitas*, 800 F.2d 1451, 1454 (9th Cir.1986). The conduct of the officers executing the search warrant must be objectively reasonable. *Leon*, 468 U.S. at 919, 104 S.Ct. at 3419. Police officers cannot ignore an unambiguous statutory directive to present the magistrate with "reasonable cause to believe a search is necessary in the night," Utah Code Ann. § 77–23–5(1) (1990), and then claim that their very failure to do so is objectively reasonable conduct on their part. *See Leon*, 468 U.S. at 919 n. 20, 104 S.Ct. at 3419 n. 20 (objective standard requires reasonable knowledge of the law by police officers); *United States v. Freitas*, 610 F.Supp. 1560, 1572 (N.D.Cal.1985) (police agency must train officers, who have obligation to ensure that warrant comports with constitutional law), *aff'd*, 800 F.2d 1451 (9th Cir.1986). In this case, the same officer prepared the affidavit, secured the warrant, and executed the search.[9] He had personal knowledge of the affidavit's contents. This further persuades us that reliance on the warrant cannot be termed "reasonable" and thus the *Leon* exception does not apply in this case.

### D. Appropriate Remedy

■ Having so concluded, we must now turn our attention to whether the warrant's issuance in violation of the nighttime search requirements necessitates suppression of the evidence seized, namely the drugs and other items found in defendant's purse. We recognize that mere ministerial and technical errors in the preparation or execution of search warrants will not, without more, invalidate the warrant. *See, e.g., State v. Buck*, 756 P.2d 700, 702–03 (Utah 1988) (violation of "knock-and-announce" rule did not require suppression when no one was at home at the time of the search to respond to the knock). *Cf. State v. Kirn*, 70 Haw. 206, 767 P.2d 1238, 1239–40 (1989) (suppression may be appropriate for violation of constitution, statute, or administrative regulation).

■ However, where a statute establishes procedures for protection of substantive rights, such as section 77–23–5 does, violation of the statute cannot be dismissed as technical or ministerial in nature and suppression of the evidence gained from the challenged search is the appropriate remedy. *Awaya v. State*, 5 Haw.App. 547, 705 P.2d 54, 59 (seizure of evidence not particularly described in the warrant required suppression), *cert. denied*, 67 Haw. 685, 744 P.2d 781 (1985); *Wiggin v. State*, 755 P.2d 115, 117 (Okla.Crim.App.1988) (violation of statute similar to section 77–23–5 mandates suppression); *State v. Coyle*, 95 Wash.2d 1, 621 P.2d 1256, 1263 (1980) (suppression required for violation of notice requirement). *But see State v. Brock*, 294 Or. 15, 653 P.2d 543, 545–46 (1982) (warrant allowing nighttime search without any showing of reasonable necessity not invalid and suppression not required, when legislature had considered and declined to enact specific exclusionary rule for such circumstances).

■ The historical character of a nighttime search further persuades us that violation of the statute requires suppression. *See Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 283–84, 69 L.Ed. 543 (1925) (question of reasonableness of a search must be viewed not only from the particular facts, but also with an eye toward what was considered reasonable at

---

9. We hasten to caution that the objective reasonableness of both the affiant officers and the executing officers must be considered in any review where the *Leon* doctrine is asserted. Were a subterfuge to be employed to insulate the affiant from actual service of the warrant in order to support a claim of good faith reliance

by executing officers, we would not hesitate to fashion an appropriate remedy. *See State v. Buck*, 756 P.2d 700, 703 (Utah 1988) (Zimmerman, J., concurring) (where officers purposefully serve a search warrant in order to avoid giving notice of authority and purpose, court will fashion a judicial remedy).

the time of the adoption of the Fourth Amendment). Searches of homes were soundly condemned by the drafters of the Bill of Rights and under English common law.[10] *See United States ex rel. Boyance v. Myers*, 398 F.2d 896, 897–98 (3d Cir. 1968). "Night-time search was the evil in its most obnoxious form." *Monroe v. Pape*, 365 U.S. 167, 210, 81 S.Ct. 473, 496, 5 L.Ed.2d 492 (1961) (Frankfurter, J., dissenting). The propriety of executing a search of an occupied dwelling at night is "sensitively related to the reasonableness" prong of the Fourth Amendment. *United States v. Gibbons*, 607 F.2d 1320, 1326 (10th Cir. 1979). *See also State v. Lindner*, 100 Idaho 37, 592 P.2d 852, 857 (1979) ("entry into an occupied dwelling in the middle of the night is clearly a greater invasion of privacy than entry executed during the daytime").

We hold that an unmitigated violation of Utah Code Ann. § 77–23–5 (1990), as is present in this case, requires suppression of all evidence gained in the search executed pursuant to the defective warrant.[11]

## CONCLUSION

The warrant was unlawful insofar as it authorized a search at night. Defendant has standing to challenge that deficiency by virtue of her status as a guest in the home. The unlawful search cannot be saved on "good faith" or abandonment grounds. It follows that the evidence found in defendant's purse should have been suppressed. Her conviction is accordingly reversed and the case is remanded for a new trial.

**10.** In an often-quoted speech condemning general warrants, Lord Chatham stated:

The poorest man may, in his cottage, bid defiance to all forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; but the King of England may not enter; all his forces dare not cross the threshold of the ruined tenement.

1 T. Cooley, *A Treatise on Constitutional Limitations* 611 (8th ed. 1927). *See also* Appendix to this opinion.

**11.** It may well be that section 77–23–5 merely codifies that which is already required under

GARFF, Judge (concurring):

I concur in the main opinion but make three further comments. First, one should not construe the main opinion so broadly as to guarantee every person invited into a home the type of privacy protected by the fourth amendment. Any number of possibilities arise where one might be classified as an "invited guest," but may not necessarily be entitled to a constitutional expectation of privacy. For example, a Fuller Brush sales person, invited into a home to demonstrate a product, may not have standing to challenge an illegal search warrant. The emphasis in *Olson*, as here, is that the circumstances that create a legitimate expectation of privacy in the home must be such that society is prepared to recognize them as reasonable. That determination is fact sensitive and the test need not be overly complex. In *Olson* it was the mere fact that defendant was an overnight guest. As an overnight guest, he had the reasonable expectation that he and his possessions would not be disturbed by anyone, and that when he was asleep and most vulnerable, he would be safe from any unwarranted intrusion. Although here we are not sure whether defendant was intended to be an overnight guest, circumstances suggest that she was in a more privileged position in the house than a casual, card playing guest: she had a close relationship with the home owner, had been there on other occasions, had free run of the house, and felt comfortable enough to "make herself at home," in a literal sense.

The second point I would make is that whenever a "canned," or preprinted affidavit is presented to a magistrate, he or she

the Fourth Amendment. *See Gooding v. United States*, 416 U.S. 430, 464, 94 S.Ct. 1780, 1797, 40 L.Ed.2d 250 (1974) (Marshall J., dissenting) (principle of requiring a showing of particularized need to conduct a nighttime search may now be a "constitutional imperative"). *See also State v. Menke*, 787 P.2d 537, 541 (Utah Ct.App. 1990) (Utah Code Ann. § 77–7–15 codifies constitutional requirements for investigative stops). *But see* Davis & Wallentine, *A Model for Analyzing the Constitutionality of Sobriety Roadblock Stops in Utah*, 3 B.Y.U.J.Pub.L. 357, 363 (1989) (section 77–7–15 requirement is more strict than the Fourth Amendment).

has an affirmative responsibility to scrutinize the factual circumstances justifying the search warrant. Conclusory or ambiguous statements in the affidavit are insufficient. This is particularly critical when the warrant authorizes nighttime intrusion into a person's home.

Finally, while the analysis in the Appendix to our opinion is good food for thought in a case where the state has argued the applicability of the good faith exception to the exclusionary rule, in joining the court's opinion I emphasize its narrow application, and in no sense intimate any view on whether the *Leon* exception does or does not make good policy, much less on whether it should or not have any vitality under our state constitution. Those questions are reserved for another day.

JACKSON, J., dissents.

## APPENDIX

The *Leon* Court, perhaps alarmed at society's prospects of failure in the so-called "drug war," premised the good faith exception on expediency. The Court concluded that the exclusionary rule's sole purpose was to deter police misconduct. This view minimizes the history of the adoption of the Fourth Amendment and the development of the exclusionary rule itself. Origins of the Fourth Amendment are based not so much upon law enforcement misconduct in executing warrantless searches, as in concerns about the unreasonable *issuance* of general search warrants. The exclusionary rule was born as a constitutional remedy for violations of the Fourth Amendment generally, with no particular emphasis on police behavior.

### General Warrants

General warrants have their derivation in thirteenth century universal authorizations granted to innkeepers to search guests for counterfeit currency. Stengel, *The Background of the Fourth Amendment to the Constitution of the United States, Part One*, 3 U.Rich.L.Rev. 278, 283 (1969). With the onset of the Age of Enlightenment and accompanying reform movements, Eng-

land's threatened monarchs issued sweeping general warrants to search papers, books, and documents for evidence of sedition and libel against the Crown. For nearly a century, members of the private printer's guild used these warrants to seize and destroy the presses of printers who failed to join their union. Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases*, 83 Colum.L.Rev. 1365, 1369 (1983).

James I, Charles I, and Charles II, rulers during the seventeenth century, instituted unprecedented general warrants allowing agents of the notorious Court of the Star Chamber to search virtually at any time and any place for seditious printed matter. *See Marcus v. Search Warrants*, 367 U.S. 717, 726, 81 S.Ct. 1708, 1713, 6 L.Ed.2d 1127 (1961). Tax collectors were granted general warrants to enter castles and cottages, at any time without notice, to enforce the hearth tax. Not until a revolution which placed a reform king, William of Orange, upon the throne, and a suit for trespass by a member of Parliament, did judicial review effectively limit the reach of general warrants. Chief Justice Pratt (Lord Camden) concluded in *Wilkes v. Wood*, 98 Eng.Rep. 489 (1763):

> The defendants claimed a right, under precedents, to force persons houses, break open escrutores, seize their papers & c. upon a general warrant, where no inventory is made of the things thus taken away, and where no offenders names are specified in the warrant, and therefore a discretionary power given to messengers to search wherever their suspicions may chance to fall. [Such power] is totally subversive of the liberty of the subject.

*Id.* at 498. *See also Entick v. Carrington*, 95 Eng.Rep. 807 (1765). These cases were known to the authors of the Fourth Amendment, and *Wilkes v. Wood* is generally regarded to be the formative inspiration for the passage of the Fourth Amendment. *See Boyd v. United States*, 116 U.S. 616, 631, 6 S.Ct. 524, 533, 29 L.Ed. 746 (1886).

## Colonial Writs of Assistance

In the American colonies, particular exception was taken to the practice of granting writs of assistance to customs officers. These writs, granted by King George II, were valid for the King's lifetime and granted unlimited power to the officers to search at any place and any time without the need for judicial review or subsequent proceedings. Stewart, *The Road to Mapp v. Ohio and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases*, 83 Colum.L.Rev. 1365, 1370 (1983).

In 1760, King George II died and new writs were required. The colonists sought judicial relief from the new writs. James Otis, a prominent attorney in the service of the Crown whose position required him to seek the writs from the Superior Court, instead resigned his post and argued the cause on behalf of sixty-three Boston citizens. N. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution* 58–59 (1937, Johns Hopkins Press; reprinted 1970, DaCapo Press). Years later, John Adams claimed it was James Otis's fiery denunciation of general warrants in open court that provided the spark for the American Revolution. *Id.*

This historical review suggests that the *issuance* of flawed warrants was of greater concern to the drafters of the Fourth Amendment than was the conduct of officers charged with the duty to execute such warrants. *See Warden v. Hayden*, 387 U.S. 294, 316, 87 S.Ct. 1642, 1655, 18 L.Ed.2d 782 (1967) (Fortas, J., dissenting) (describing the text of the original draft of the Fourth Amendment).

## The Exclusionary Rule

An exclusionary rule was first applied in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). It is instructive that *Boyd* involved no issue of police action or misconduct. The challenge in *Boyd* was to a judicially-issued subpoena in a civil forfeiture case. Paralleling the circumstances under which the writs of assist-

ance were condemned, *Boyd* involved a subpoena for books and papers of merchants accused of unlawfully importing glass. *Id.* at 621, 6 S.Ct. at 527. The Supreme Court concluded that because the papers were sought for what was essentially a criminal process, forfeiture for customs duties, the Fourth Amendment applied. However, the Court did not order suppression directly on Fourth Amendment grounds. Rather, the Court reasoned that the forced production of incriminatory papers and documents would violate the Fifth Amendment and accordingly ordered suppression of the material obtained under the subpoena.

Twenty-two years later, a unanimous Court decided *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), which firmly established the exclusionary rule as a fundamental principle of Fourth Amendment law. Defendant Weeks had been convicted of gambling, on the basis of personal papers which were unlawfully seized. Before trial, Weeks moved for the return of his illegally seized papers. The Court held that the government was constitutionally bound to return the improperly seized documents, which could not then be subpoenaed by the prosecution, and reversed Weeks' conviction. *Id.* at 398, 34 S.Ct. at 346. *See also* Schrock & Welsh, *Up From Calandra: The Exclusionary Rule as a Constitutional Requirement*, 59 Minn.L.Rev. 251, 295–308 (1974) (discussing the impact of the *Weeks* decision).

A few years later, the Court decided *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and *Gouled v. United States*, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). The combined cases framed the exclusionary rule as barring any use whatsoever of improperly seized evidence. Writing for the Court in *Silverthorne*, Justice Oliver Wendell Holmes stated: "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." 251 U.S. at 392, 40 S.Ct. at 183. Ultimately, and after further refinement, the Fourth Amendment exclu-

sionary rule was applied to the states through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081 (1961).

Against this background, it would seem appropriate that courts considering the scope of the Fourth Amendment exclusionary rule be mindful of the process of review and issuance of the warrant, as well as the lawfulness of the police officer's execution thereof.

### The Trouble with *Leon*

It is viewed from this historical perspective that *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), represents such a qualitative change in the development of exclusionary rule jurisprudence. Writing for the Court, Justice White offered three justifications for the conclusion that the exclusionary rule was aimed at police misconduct and had no impact on the judicial review of warrant applications. First, he declared that the exclusionary rule was not designed to deter judges from error. *Id.* at 916, 104 S.Ct. at 3417. "Second, there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment...." *Id.* Finally, and "most important," judges are neutral judicial officers, not adjuncts to law enforcement administration, and the exclusionary rule will have no practical deterrent effect on them. *Id.* at 916–17, 104 S.Ct. at 3417.

The first and third assertions seem at odds with the fact that the exclusionary rule, as first "designed" in *Boyd*, was expressly created as a remedy for judicial error. Moreover, these assertions discount the historical concerns about the *issuance* of general warrants and writs of assistance. In the instant case, there is no allegation of police misconduct in the warrant application process. The defect in the warrant might have been easily cured by careful questioning by an attentive magistrate. This is likely the more common scenario when a warrant's validity is challenged. *See State v. Marsala*, 216 Conn. 150, 579 A.2d 58, 67 (1990). Often the reviewing judge will simply evaluate the warrant application for gross errors of law or something out of the ordinary, acting, in effect, as a rubber stamp. *See* Goldstein, *The Search Warrant, the Magistrate, and Judicial Review*, 62 N.Y.U.L.Rev. 1173, 1182 (1987); Wasserstrom & Mertens, *The Exclusionary Rule on the Scaffold: But Was it a Fair Trial?*, 22 Am.Crim.L.Rev. 85, 108–09 (1984) (citing statistical evidence of lax warrant review standards). Much of the exclusionary rule's vigor prior to *Leon* was in requiring the magistrate to assiduously exercise his or her Fourth Amendment duty by carefully scrutinizing warrant applications.

Justice White's second assertion, if true, calls into serious question the practical need for the *Leon* exception to the exclusionary rule. He gives high marks to judges and magistrates, claiming that few issue warrants not firmly grounded in probable cause. If indeed this is so, *but see id.*, the exclusionary rule would almost never be invoked in warrant-based searches, even without the *Leon* doctrine, since the magistrate will have scrutinized the application and issued the warrant only upon a detailed and well-supported showing of probable cause. Thus, the societal costs of the exclusionary rule, a great concern for the *Leon* Court, will be minuscule in the context of cases where a warrant is obtained.

It may additionally be questioned whether the societal costs of the exclusionary rule are as onerous as Justice White believes them to be. The *Leon* Court reasoned that the "marginal or nonexistent benefits produced by suppressing evidence ... cannot justify the substantial costs of exclusion." 468 U.S. at 922, 104 S.Ct. at 3420. But several scholars who have examined *Leon*'s "economic" conclusions refute them as groundless in fact. *See* Nardulli, *The Societal Costs of the Exclusionary Rule Revisited*, 1987 U.Ill.L.Rev. 223, 239 (exclusionary rule accounts for less than two percent of case attrition); 1 W. LaFave, *Search & Seizure* § 1.3 at 46 n. 5 (2d ed. 1987 & Supp.1990). Moreover, while the societal cost of suppressing evidence may in some respects be more tangi-

ble—it surely prompts an understandable visceral reaction by many—the system's use of illegally obtained evidence is not without societal costs of its own. True, it may be, that freeing a criminal because the constable (or magistrate) erred is not an entirely satisfactory state of affairs. But in a society committed to the notion that governmental action as well as citizen behavior is subject to the rule of law, it should also be regarded as an unsatisfactory state of affairs to countenance the use of evidence that should not have been uncovered, under our rules, to convict a citizen of some crime.

We believe the exclusionary rule may well have, as a substantial purpose, the objective of requiring careful judicial scrutiny of warrant applications. Simply put, it is unlikely magistrates are any more pleased to have their warrants "thrown out" by reviewing courts than are the police to have their evidence "thrown out." Such stimulation extends also to appellate review. Rigorous appellate review of search warrants and the accompanying benefit of defining search and seizure law would be effectively precluded if *Leon* were given wide rein, as the court would have little occasion to proceed beyond an inquiry into the trial court's finding of the officer's good faith. Similarly, issuing magistrates who are less than zealous in their devotion to the Fourth Amendment would have little motivation to look beyond the face of the warrant, knowing that as long as the warrant is facially proper, the appellate court would not interfere in view of the officer's good faith in executing a facially proper warrant.

Were an officer permitted to rely on a facially valid warrant without more being required of him or her, there would be no incentive for advanced training which would enable officers to better fulfill their duty to uphold the constitutions of the United States and of this state. Moreover, the well-trained officer or prosecutor securing a warrant will be in a position to prevent the very harm which led to the good faith exception. An officer who is motivat-ed to prepare a constitutionally adequate warrant application will be less likely to rush through a warrant application, and will more carefully evaluate the sufficiency of probable cause, so that the warrant will withstand ultimate review and not merely gain the signature of an issuing magistrate. Similarly, the prosecutors who must argue the validity of warrants in court will be circumspect in their assessment of the sufficiency of probable cause when asked for advice before a warrant application is presented.

### Fourth Amendment Conclusion

It may be persuasively argued that the exclusionary rule serves purposes beyond influencing the behavior of individual officers and officials. *See, e.g., United States v. Leon,* 468 U.S. 897, 975–80, 104 S.Ct. 3430, 3453–56, 82 L.Ed.2d 677 (1984) (Stevens, J. dissenting) (noting justifications for exclusionary rule not tempered with "good faith" exception as also including assurance of some remedy for violation of constitutional rights and as placing judiciary beyond the "dirty business" of using the fruits of unlawful searches to secure convictions). But insofar as its purpose is to influence behavior, the rule can serve to promote discipline, thoroughness, and care on the part of *all* actors in the process—police who secure warrants, prosecutors who aid in that process, magistrates who issue warrants, and police who execute warrants. Any exception to the rule which focuses on the rule's impact on only one of those groups, officers who carry out searches, is open to legitimate criticism.

As and when the appellate courts of this state are squarely confronted with the question of whether the exclusionary rule existing by virtue of Article I, Section 14, of the Utah Constitution is subject to a *Leon*-type "good faith" exception, a healthy skepticism should permeate the courts' consideration in view of the troublesome analysis in *Leon.*