2004 UT App 163

**STATE of Utah, Plaintiff and Appellee,**

v.

**Joshua EARL, Defendant and Appellant.**

**No. 20020821–CA.**

Court of Appeals of Utah.

May 13, 2004.

Rehearing Denied July 27, 2004.

Catherine E. Lilly, Lori J. Seppi, and Ralph W. Dellapiana, Salt Lake Legal Defender Association, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General, Jeffrey S. Gray, and Colleen K. Coebergh, Assistant Attorneys General, Salt Lake City, for Appellee.

Before BILLINGS, P.J., and BENCH, Associate P.J., and THORNE, J.

## OPINION

THORNE, Judge:

¶ 1 Defendant Joshua Earl appeals from his conviction of one count of possession of clandestine laboratory precursors and/or equipment, a second degree felony, in violation of Utah Code Annotated section 58–37d–4(1) (1998).

## BACKGROUND [1]

¶ 2 On November 4, 2001, Earl was sitting in the rented home of his stepbrother, Jeremy Allen. Allen's tenancy in the home began in May 2001, when he entered into an oral contract with Sheila Gledhill, his mother. His contract required him to pay a monthly rental fee of $350 and to properly maintain the interior and exterior of the home. By November, however, Allen had fallen behind in his payments and Gledhill decided that his efforts at maintaining the interior were insufficient. Consequently, Gledhill decided that her only recourse was to evict her son from the property. However, prior to November 4, 2001, Gledhill did not inform her son of her decision to evict him. Instead, on the morning of November 4, 2002, she drove to the home intent on telling him in person.

¶ 3 Prior to talking to her son, however, Gledhill twice contacted the South Salt Lake Police Department. Although the department declined to assist her with the first matter, removal of a vehicle from her husband's neighboring business, following her second call, the department dispatched an officer. During the second call, Gledhill apparently explained that she desired to evict her son from the home and that the home might be housing a methamphetamine lab, as well as operators of the lab. Consequently, South Salt Lake Police Officer Dean Brimley was dispatched to investigate.[2] When Brimley arrived, Gledhill explained her concerns more fully. In sum, Gledhill explained to Brimley that a clerk at a local convenience store had told her that she had heard that the house was being used as a methamphetamine laboratory and that the lab was being run by "a skinhead named Marvin."[3] Gled-

1. "The facts are recited in a light most favorable to the trial court's findings from the suppression hearing." *State v. Moreno*, 910 P.2d 1245, 1246 (Utah Ct.App.1996).

2. According to Brimley's testimony, he was the only officer initially dispatched, but after he entered the house other officers arrived.

3. Gledhill later provided the police with a written statement to this effect.

hill also informed Brimley that her son had a drug problem involving both marijuana and methamphetamine. Gledhill asked Brimley to "stand by [and] keep the peace, while she evicted her son from the residence."

¶ 4 Brimley agreed to "keep the peace" and accompanied Gledhill to the door. Using a key she had in her possession, and without knocking or gaining Allen's permission, Gledhill opened the door and entered the home. Brimley followed closely on her heels. To his right, approximately fifteen feet away, Brimley saw four men sitting around a table in the kitchen. At least one of the men was playing a computer game. Directly in front of Brimley, in the living room area, he saw drug paraphernalia, a "bong," and, sitting on the floor near a backpack, material that suggested possible methamphetamine production. This material included a row of glass bottles, later determined to be iodine bottles, and several boxes of pseudoephedrine.

¶ 5 Because each of the men was larger than he, and believing that the kitchen created a dangerous environment, Brimley asked each man to identify himself, and then to walk over to Brimley. With the exception of Earl, each man produced picture identification and calmly walked over to Brimley where he frisked them for weapons, discovering nothing. In contrast, after he claimed that he did not have identification, Earl told Brimley that his name was "Justin Gannon" and provided Brimley with a birth date. He then approached Brimley and, when asked, admitted that he was carrying two knives. Brimley patted Earl down and found both a pocket knife and a knife with a ten-inch fixed blade strapped to the small of Earl's back. Brimley also located something that felt like a wallet in Earl's pocket, which he then asked Earl to retrieve. Earl complied. In the wallet, Brimley found Earl's identification, which clearly indicated that Earl had lied to Brimley. Consequently, Brimley arrested Earl for providing false information. Earl was then handcuffed and placed on a couch located some ten feet from the contraband Brimley had seen upon entry, and some

twenty feet from Earl's location prior to being ordered to approach Brimley.

¶ 6 Soon thereafter, Brimley escorted everyone outside where he asked Allen to sign a consent to search form. Allen complied. Although there is some confusion as to the timing, it is clear that after Earl was arrested Brimley searched the backpack that he had seen upon entering the home. In the backpack, Brimley discovered documents linking the backpack to Earl, several rubber stoppers, additional glass iodine bottles, plastic scales, a plastic bag filled with a "red substance," a two ounce container filled with "red sludge," a one ounce container filled with "red sludge," and a book detailing the manufacturing process for methamphetamine. The "red sludge" and "red substance" were later determined to be phosphorus, a key ingredient in methamphetamine production. Brimley then called in the South Salt Lake City methamphetamine investigation team to search the residence. The team arrived and searched the house, but no additional evidence of criminal activity was found.

¶ 7 Following the search, Earl was charged with possession of clandestine drug lab precursors and/or equipment, with enhancements, a first degree felony; possession of a dangerous weapon by a restricted person, a third degree felony; and unlawful possession of drug paraphernalia, a class B misdemeanor.[4] Earl, however, moved to suppress the evidence that supported the charges arguing that Brimley's entry into Allen's home violated Earl's Fourth Amendment rights and that everything discovered after entry was "fruit of the poisonous tree." After fully considering the issues presented, the trial court denied Earl's motion, prompting Earl to accept the State's proffered plea bargain. Earl pleaded guilty to felony possession of clandestine laboratory precursors and/or equipment as a second degree felony, and the State dismissed all remaining charges and enhancements. Earl's plea was conditioned on the outcome of the instant appeal, pursuant to *State v. Sery*, 758 P.2d 935 (Utah Ct.App.1988).

4. Although Earl was arrested for providing false information to the police, and the evidence used to convict him was discovered through a search

incident to that arrest, Earl was not charged with that crime.

ISSUE AND STANDARD OF REVIEW

¶ 8 Earl argues that the trial court erred in denying his motion to suppress. When reviewing a trial court's suppression order, we review its factual findings for clear error, and its legal conclusions for correctness. *See State v. Rynhart*, 2003 UT App 410,¶ 9, 81 P.3d 814.

ANALYSIS

I. Reasonable Expectation of Privacy

¶ 9 As a threshold matter, the State argues that Earl is in no position to argue for the suppression of the evidence because he had no legitimate expectation of privacy in Allen's home. We disagree.

■ ¶ 10 " '[R]ights such as those conferred by the Fourth Amendment are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched.' " *Minnesota v. Carter*, 525 U.S. 83, 101, 119 S.Ct. 469, 479, 142 L.Ed.2d 373 (1998) (Kennedy, J., concurring) (quoting *Steagald v. United States*, 451 U.S. 204, 219, 101 S.Ct. 1642, 1651, 68 L.Ed.2d 38 (1981)). Consequently, Earl must demonstrate that he possessed a *subjective* expectation of privacy " 'in the premises searched and that society is prepared to recognize that expectation as reasonable.' " *United States v. Rhiger*, 315 F.3d 1283, 1285 (10th Cir.2003) (quoting *United States v. Higgins*, 282 F.3d 1261, 1270 (10th Cir.2002)), *cert. denied,* ── U.S. ──, 124 S.Ct. 90, 157 L.Ed.2d 65 (2003); *see also State v. Loya*, 2001 UT App 3,¶ 10, 18 P.3d 1116. "An expectation of privacy is reasonable if it arises from a source 'outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " *United States v. Gordon*, 168 F.3d 1222, 1225–26 (10th Cir.1999) (quoting *Rakas v. Illinois*, 439 U.S. 128, 144 n. 12, 99 S.Ct. 421, 431 n. 12, 58 L.Ed.2d 387 (1978)). A failure to so demonstrate will result in a conclusion that no legitimate expectation exists. *See Carter*, 525 U.S. at 101, 119 S.Ct. at 479 (Kennedy J., concurring).

■ ¶ 11 Earl's principal argument is that his status as a resident of Allen's home vested him with a legitimate expectation of privacy. The trial court was unwilling ·to accord Earl status as a resident. "A trial court's factual findings will not be overturned unless they are clearly erroneous." *State v. Lafferty*, 2001 UT 19,¶ 45, 20 P.3d 342. We defer to the trial court's judgment in large part because it is in a far superior position to assess the credibility of the witnesses. *See id.* Accordingly, to succeed in challenging a trial court's ruling, Earl must " 'marshal the evidence in a light most favorable to the findings of the trial court and show that evidence to be insufficient' " to support the finding. *Id.* Here, the trial court specifically found that Earl was not a resident of the home. Earl, however, does not marshal the evidence that supports this finding, choosing instead to reiterate his own testimony. Although it is true that Earl testified that he resided in the home, the landlord testified that he did not, and that she was in a position to know. The trial court, apparently believing the landlord over Earl, thus made a credibility determination. Earl makes no showing that the trial court's reliance on the landlord's testimony was clearly erroneous; consequently, we affirm the trial court's finding as to Earl's status as a visitor to the house. *See, e.g., State v. Hurst*, 821 P.2d 467, 471 (Utah App.1991) (stating "[b]ecause she failed to marshal the evidence, we accept the challenged finding").

¶ 12 Pursuant to *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), and *State v. Rowe*, 806 P.2d 730 (Utah Ct.App.1991), *rev'd on other grounds*, 850 P.2d 427 (Utah 1992), however, Earl also argues, albeit somewhat obliquely, that as Allen's guest he was vested with a legitimate expectation of privacy in the home.

¶ 13 In *Olson*, the United States Supreme Court conclusively determined that "status as an overnight guest is alone enough to show that [a person] ha[s] an expectation of privacy in the home that society is prepared to recognize as reasonable." 495 U.S. at 96–97, 110 S.Ct. at 1688. The Court founded this

decision on its understanding that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society.... [W]e think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home." *Id.* at 98, 110 S.Ct. at 1689. The Court further stated that "[f]rom the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside." *Id.* at 99, 110 S.Ct. at 1689. Finally, the Court concluded

> that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household.

*Id.*

¶ 14 In *Carter,* the Court refined its *Olson* analysis. Effectively, the Court distinguished the protections afforded an overnight houseguest present in a host's home by invitation from the absence of protections afforded "one who is merely present with the consent of the householder." 525 U.S. at 90, 119 S.Ct. at 473. In making this distinction, however, the Court noted that the range of possibilities is not fully encompassed by reference to the invited overnight guest and the person present with consent. *See id.* at 91, 119 S.Ct. at 474. Instead, the range is broad, and in any circumstance, the determination of whether a person is vested with a legitimate expectation of privacy will depend on the facts presented. *See id.* For instance, the Court determined that the *Carter* defendants were not vested with a legitimate expectation of privacy because (1) the defendants were in the home for only a short period of time; (2) there was a "lack of any

previous connection between [the defendants] and the householder"; and (3) the defendants were engaged in a purely commercial transaction while in the home. *Id.* From these facts, the Court concluded that the defendants did not qualify either as overnight guests, or as persons merely "legitimately on the premises." *Id.* Instead, the Court concluded that the defendants fell "somewhere in between" the ends of the spectrum. *Id.* But, the middle ground afforded the defendants no shelter, because, after examining the specific facts of the case, the Court ultimately concluded that the defendants' situation was "closer to that of one simply permitted on the premises" and denied them the protection of the Fourth Amendment. *Id.*

¶ 15 Finally, in *State v. Rowe,* relying on *Olson,* this court examined, inter alia, whether the Fourth Amendment extends its protection to all invited social guests in a host's home when police officers enter. *See Rowe,* 806 P.2d at 735. After examining the specific language of *Olson,* we concluded that "there is no talismanic significance ... to the length of time a social guest is in the home." *Id.* Instead, we determined that a person's status as an "invited guest" is sufficient to vest the individual with an expectation of privacy that society is prepared to recognize. *Id.* at 736.[5] Therefore, under the combined holdings of *Olson, Carter,* and *Rowe,* if, as Earl argues, he was present in Allen's home as an invited social guest, we must then conclude that he has a vested legitimate expectation of privacy that he can raise to dispute the propriety of the search.

¶ 16 We next address whether Earl was a social guest, with the accompanying expectations of privacy, or simply a business invitee, as urged by the State. It is undisputed that Earl is related to Allen, having been identified by Gledhill as Allen's stepbrother. Moreover, Earl's own testimony

---

5. The State argues that our legitimate expectation of privacy discussion in *State v. Rowe,* 806 P.2d 730 (Utah Ct.App.1991), *rev'd on other grounds by,* 850 P.2d 427 (Utah 1992), is undermined by both the Utah Supreme Court's reversal of the decision and *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). We disagree. The Utah Supreme Court did not disturb our reasonable expectation of privacy reasoning or conclusion in *Rowe,* and a close reading of *Carter* suggests that *Rowe* was correctly decided. *See Carter,* 525 U.S. at 99, 119 S.Ct. at 478 (Kennedy, J., concurring) ("I join the Court's opinion, for its reasoning is consistent with my view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home.").

suggests that he has an ongoing relationship with Allen and that they were friends. Thus, the nature of the relationship suggests he was accepted by Allen as a part of his family and that his presence in the home was not unusual. *Cf. United States v. Heath*, 259 F.3d 522, 532 (6th Cir.2001) (noting that "when determining whether a defendant is entitled to the protections afforded by *Olson*, reviewing courts should consider whether there was a 'previous relationship' with the [host] or if there is any indicia 'of acceptance into the household'" (citation omitted)). It is also undisputed that at the time Brimley entered the home Earl was seated next to Allen at the kitchen table and that the two were engaged in playing, or watching another person play, a computer game. Moreover, aside from the contraband that was lying on the living room floor, some distance from the men in the house, there was no evidence that Earl, or any of the occupants of the home, were actively engaged in any illegal activity at that time. Nor was there was any evidence that anyone, including Earl, was using the residence to produce, package, or sell methamphetamine. Finally, similar to the defendant in *Rowe*, Earl felt comfortable enough to leave his belongings in another room while he spent time in the kitchen where computer games were being played. *See Rowe*, 806 P.2d at 736 (stating that the "defendant felt secure enough in the home to remove her shoes, leave her purse beyond her view, and roam to rooms other than where her fellow guests were playing cards").

¶ 17 We conclude that although Earl was not an overnight guest, his situation more closely resembled an overnight guest's position. Thus, we conclude that Earl had a legitimate expectation of privacy in Allen's home. *See also State v. Suco*, 1987 Fla.App. LEXIS 11995, *6 (Fla.Dist.Ct.App. March 3, 1987) ("[A]n invited guest has a reasonable expectation of privacy in the home while physically on the premises at the invitation of the home dweller."). Consequently, we turn our attention to Earl's substantive claims.

## II. Validity of and Reliance Upon Landlord Consent

¶ 18 Earl argues that Brimley's entry into the house violated Earl's right to be free from unreasonable searches and seizures. "It is axiomatic that 'the right to be free from unreasonable searches and seizures embodied in the Utah and United States Constitutions is one of the most fundamental and cherished rights we possess.'" *State v. Trane*, 2002 UT 97, ¶ 21, 57 P.3d 1052 (citation omitted). Thus, it has long been established that in the absence of a valid search warrant, "[t]he State must demonstrate 'that the circumstances of the [search or] seizure constitute an exception to the warrant requirement.'" *State v. Wells*, 928 P.2d 386, 389 (Utah Ct.App.1996) (citations omitted). In the absence of either a warrant or facts that establish the existence of an exception to the warrant requirement, any evidence discovered as a result of the search must be suppressed. *See, e.g., id.*, at 389–91 (determining that the state's evidence must be suppressed after the state failed to demonstrate the applicability of an exception to the warrant requirement).

¶ 19 Brimley entered Allen's home without a warrant and the State does not argue that any exception to the warrant requirement exists that would sufficiently justify Brimley's conduct. Although the trial court found that the initial entry was justified because Gledhill consented to it, to a large extent, the State abandons this position on appeal.[6] Having reviewed the trial court's findings, we conclude that the trial court erred in determining that Gledhill's consent was sufficient to authorize Brimley's entry into the home and that Brimley was reasonable in relying on her consent.

¶ 20 In *Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), the United States Supreme Court determined that a landlord does not have the right to enter and search premises he has rented to another during the occupant's tenancy. *See id.* at 616–18, 81 S.Ct. at 779–80. Nor

---

6. On appeal, the State asserts only two substantive arguments—(1) that the search was justified incident to Earl's arrest, and (2) that Earl did not have a reasonable expectation of privacy in Allen's home—and makes only passing reference to issues of consent.

does the landlord have the authority to grant such access to the authorities, because

to uphold such an entry, search and seizure without a warrant would reduce the Fourth Amendment to a nullity and leave tenants' homes secure only in the discretion of landlords. Moreover, it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical. We ought not to bow to them in the fair administration of the criminal law.

*Id.* at 616–17, 81 S.Ct. at 780 (quotations, alterations, and citations omitted). Consequently, although a landlord possesses the bundle of property rights associated with property ownership, he does not possess the authority to grant police officers access to property leased to a tenant.

■ ¶ 21 However, it is equally true that status as a landlord does not act as a per se ban on the authority to grant access to search. If the landlord has "joint access or control for most purposes" the landlord is then considered to possess "common authority" over the property, and he will then have the authority to allow the authorities in to search. *United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974). Moreover, even in the absence of actual "common authority," if it would be reasonable for an officer to believe that the landlord had "common authority," pursuant to *Matlock,* when a landlord consents to the warrantless entry, the entry and search will be deemed valid. *Cf. Illinois v. Rodriguez,* 497 U.S. 177, 188–89, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990). In other words, if the facts available to the officer when the landlord consents to the entry would lead a reasonable officer in that position to believe that the landlord had common authority over the property, then the consent

will be deemed valid. *See id.* However, "[e]ven when the invitation is accompanied by an explicit assertion ·that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Id.* at 188, 110 S.Ct. at 2801.

■ ¶ 22 Here, Gledhill is unquestionably the landlord of the property. The property is rented by her son, and he is the only person that Gledhill authorized to live in the house. Moreover, the record is clear: Gledhill did not live in the home with her son during his tenancy. Thus, Gledhill, as the landlord of the property, did not have "common authority" over the property for Fourth Amendment purposes. Moreover, when Gledhill contacted the police, it is clear that she did so seeking assistance in evicting her son from the property. She informed the South Salt Lake Police Department, and Officer Brimley, that she did not live in the house and that, since renting it to her son, she had been inside only on occasion. She also told Brimley that she was concerned because a local convenience store clerk had told her that a "skinhead named Marvin" was living in the home, and that he was "running a meth lab" at the house. Consequently, Brimley could not reasonably believe that Gledhill had common authority over the home sufficient to vest her with authority to consent to his entry into the home. Accordingly, because Brimley entered the home without a warrant and without the safe-harbor of an exception to the warrant requirement, his entry violated the Fourth Amendment to the United States Constitution.

### III. Earl's Intervening Illegal Act

■ ¶ 23 Under other circumstances, Brimley's violation would be dispositive. However, the State argues that Earl's intervening illegal act, committed after Brimley entered the home, dramatically changes the outcome. We agree.[7] "An illegal entry or

---

**7.** A review of case law from around the nation suggests that any illegal act is sufficient to remove the taint of the prior illegality. However, the majority of cases involve some affirmative

physical act, most violent, on the part of the defendant. *See Clark v. United States,* 755 A.2d 1026, 1029–30 (D.C.2000) (discussing cases involving intervening illegalities); *see also United*

prior illegality by officers does not affect the subsequent arrest of a defendant where there is an intervening illegal act by the suspect." *State v. Griego*, 933 P.2d 1003, 1008 (Utah Ct.App.1997). Moreover, if the arrest was lawful, evidence discovered in a search incident to the arrest, "including all evidence discovered by serendipity of crimes other than that for which the suspect is arrested, is admissible in a criminal trial." *State v. Trane*, 2002 UT 97,¶ 23, 57 P.3d 1052. Finally, although illegal entry by police can result in the suppression of any evidence discovered through the illegal entry, "[s]uppression is not justified unless 'the challenged evidence is in some sense the product of illegal government activity.'" *Segura v. United States*, 468 U.S. 796, 815, 104 S.Ct. 3380, 3391, 82 L.Ed.2d 599 (1984) (citation omitted). Stated differently, challenged evidence is admissible, "notwithstanding a prior illegality, when the link between the illegality and [the challenged] evidence was sufficiently attenuated to dissipate the taint" of the prior illegality. *Id.* When the defendant commits an intervening illegal act, the taint of the prior illegality is considered dissipated, and any evidence discovered pursuant to a search incident to arrest is admissible. *See Clark v. United States*, 755 A.2d 1026, 1029–30 (D.C.2000) (noting that, in the context of an intervening illegal act "[t]he vast majority of appellate courts have [refused] to suppress either evidence of the distinct crime itself or evidence seized incident to arrest for the distinct crime").[8]

■ ¶ 24 Here, the State argues, and Earl concedes, that in an attempt to mislead Brimley, Earl gave Brimley a false name and birth date when Brimley asked him for identification. *See* Utah Code Ann. § 76-8-507 (2003) ("A person commits a class C misdemeanor if, with intent of misleading a peace officer as to the person's identity ... the person knowingly gives a false name ... to a peace officer[.]").[9] Earl further concedes that having committed the illegal act in Brimley's presence, Earl was subject to ar-

---

*States v. Crump*, 62 F.Supp.2d 560, 568 (D.Conn. 1999) (same). Few cases involve nonviolent behavior, *see, e.g., United States v. Pryor*, 32 F.3d 1192, 1195–96 (7th Cir.1994) (involving a defendant's misrepresentation of identity to a police officer), and no Utah cases involve circumstances analogous to the instant case. In any event, Earl concedes that his arrest was legal. Thus, in the absence of guidance from either the United States Supreme Court or our own Utah Supreme Court on this issue, we are compelled to apply the principle that any illegal act, regardless of its nature, is sufficient to break the nexus of police illegality. *See State v. Griego*, 933 P.2d 1003, 1008 (Utah App.1997) (stating "extending the fruits doctrine to immunize a defendant from arrest for new crimes gives a defendant an intolerable carte blanche to commit further criminal acts so long as they are sufficiently connected to the chain of causation started by the police misconduct").

8. In addition to finding that Earl had committed an illegal act in the presence of Brimley, the trial court found that Allen had voluntarily consented to a search of the house. While we see no reason to disturb this finding,

   [w]hen evidence is obtained pursuant to a consent to search which follows on the heels of a[F]ourth [A]mendment violation, we consider not only whether the consent itself was voluntarily given, but also whether it was independent of the violation to such a degree as to cause a "break in the chain of events sufficient to refute the inference that the evidence was a

product of the constitutional violation." This analysis applies even when, as here, the person who gave consent was not the person whose constitutional rights were violated.

*United States v. Vega*, 221 F.3d 789, 801 (5th Cir.2000) (citations and footnotes omitted). Although we accept that Allen's consent was voluntary, the State wisely abandons any attempt to justify the evidence as discovered incident to Allen's consent. The trial court made no findings directed toward attenuation and the record does not support a conclusion that Allen's "voluntary" consent was sufficiently "independent of the violation to such a degree as to cause a 'break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation.'" *Id.* (citation and footnote omitted). Consequently, even though Allen's consent was voluntary, we cannot say that it was gained independent of Brimley's prior illegality.

9. Interestingly, Earl does not argue here, and did not argue below, that Brimley's *Terry* frisk was unreasonable, nor that Brimley's request to remove Earl's wallet exceeded the scope of what is permitted under *Terry*. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Earl further chose not to challenge Brimley's orchestration of the search, moving Earl's location from the kitchen to the area where Brimley had already seen evidence of criminal activity. Consequently, we review only the narrow question of whether the search incident to arrest was valid under the circumstances.

rest. *See id.* § 77-7-2(1) (2003). Moreover, Earl concedes that the subsequent search incident to his arrest was valid under *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973) (reaffirming the reasonability of the search incident to arrest), and its progeny. Consequently, the evidence discovered during the search incident to Earl's arrest was admissible against Earl, and the trial court did not err in denying Earl's motion to suppress.[10]

## CONCLUSION

¶ 25 As an invited social guest, Earl had a legitimate expectation of privacy in Allen's home while he was there. Earl's right was not diminished or extinguished by Allen's landlord's illegitimate consent to Brimley's entry into the house. Consequently, Brimley's warrantless entry into the home violated the Fourth Amendment. However, because Earl committed a subsequent intervening illegal act in Brimley's presence, Brimley was justified in arresting him. Therefore, all evidence seized in Brimley's search incident to Earl's arrest is admissible.

¶ 26 Accordingly, we affirm the trial court's denial of Earl's motion to suppress.

¶ 27 I CONCUR: JUDITH M. BILLINGS, Presiding Judge.

10. Although Earl concedes that his arrest was lawful and that the subsequent search did not violate the dictates of *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), he asserts that *Robinson* does not present the proper test. Instead, Earl argues that "an extra layer of analysis" is required to ensure that the arrest was not a pretext to allow Brimley to search. Although we are sympathetic to Earl's argument, we ultimately find it to be unconvincing. *See Clark*, 755 A.2d at 1029-30 (noting, in the context of an intervening illegal act that "[t]he vast majority of appellate courts have [refused] to suppress either evidence of the distinct crime itself or evidence seized incident to arrest for the distinct crime"). Rather than focusing on a pretext analysis, which would require a foray into an officer's subjective intent during an incident, our focus is on whether "the link between the illegality and [the challenged] evidence was sufficiently attenuated to dissipate the taint" of the prior illegality. *Segura v. United States*, 468 U.S. 796, 815, 104 S.Ct. 3380, 3391, 82 L.Ed.2d 599 (1984). More often than not, an arrest for

¶ 28 I CONCUR IN THE RESULT: RUSSELL W. BENCH, Associate Presiding Judge.

an intervening illegality will dissipate the taint of the prior illegality, shifting the focus to the scope of the search incident to the arrest.

As the Seventh Circuit stated,
It would be startling to suggest that because the police illegally stopped an automobile, they cannot arrest an occupant who is found to be wanted on a warrant—in a sense requiring an official call of "Olly, Olly, Oxen Free." Because the arrest is lawful, a search incident to the arrest is also lawful. The lawful arrest of [the defendant] constituted an intervening circumstance sufficient to dissipate any taint caused by the illegal [seizure].

*United States v. Green*, 111 F.3d 515, 521 (7th Cir.1997). Consequently, we do not adopt the test urged by Earl and, even if adopting Earl's position were possible, we are loathe to return to a time where courts frequently were called upon to determine an officer's subjective intent during the course of prosecuting his or her responsibilities.